## FLOOD *v.* KUHN ET AL.

No. 71–32. Argued March 20, 1972—Decided June 19, 1972

BLACKMUN, J., delivered the opinion of the Court, in which STEWART and REHNQUIST, JJ., joined, and in all but Part I of which BURGER, C. J., and WHITE, J., joined. BURGER, C. J., filed a concurring opinion, *post,* p. 285. DOUGLAS, J., *post,* p. 286, and MARSHALL, J., *post,* p. 288, filed dissenting opinions, in which BRENNAN, J., joined. POWELL, J., took no part in the consideration or decision of the case.

*Arthur J. Goldberg* argued the cause for petitioner. With him on the briefs was *Jay H. Topkis.*

*Paul A. Porter* argued the cause for respondent Kuhn. *Louis F. Hoynes, Jr.,* argued the cause for respondents Feeney, President of National League of Professional Baseball Clubs, et al. With them on the brief were *Mark F. Hughes, Alexander H. Hadden, James P. Garner, Warren Daane,* and *Jerome I. Chapman.*

Mr. Justice Blackmun delivered the opinion of the Court.

For the third time in 50 years the Court is asked specifically to rule that professional baseball's reserve system is within the reach of the federal antitrust laws.[1]

---

[1] The reserve system, publicly introduced into baseball contracts in 1887, see *Metropolitan Exhibition Co.* v. *Ewing*, 42 F. 198, 202–204 (CC SDNY 1890), centers in the uniformity of player contracts; the confinement of the player to the club that has him under the contract; the assignability of the player's contract; and the ability of the club annually to renew the contract unilaterally, subject to a stated salary minimum. Thus

A. Rule 3 of the Major League Rules provides in part:

"(a) UNIFORM CONTRACT. To preserve morale and to produce the similarity of conditions necessary to keen competition, the contracts between all clubs and their players in the Major Leagues shall be in a single form which shall be prescribed by the Major League Executive Council. No club shall make a contract different from the uniform contract or a contract containing a non-reserve clause, except with the written approval of the Commissioner. . . .

. . . . .

"(g) TAMPERING. To preserve discipline and competition, and to prevent the enticement of players, coaches, managers and umpires, there shall be no negotiations or dealings respecting employment, either present or prospective, between any player, coach or manager and any club other than the club with which he is under contract or acceptance of terms, or by which he is reserved, or which has the player on its Negotiation List, or between any umpire and any league other than the league with which he is under contract or acceptance of terms, unless the club or league with which he is connected shall have, in writing, expressly authorized such negotiations or dealings prior to their commencement."

B. Rule 9 of the Major League Rules provides in part:

"(a) NOTICE. A club may assign to another club an existing contract with a player. The player, upon receipt of written notice of such assignment, is by his contract bound to serve the assignee.

. . . . .

"After the date of such assignment all rights and obligations of the

Collateral issues of state law and of federal labor policy are also advanced.

## I

## The Game

It is a century and a quarter since the New York Nine defeated the Knickerbockers 23 to 1 on Hoboken's

---

assignor clubs thereunder shall become the rights and obligations of the assignee club . . . ."

C. Rules 3 and 9 of the Professional Baseball Rules contain provisions parallel to those just quoted.

D. The Uniform Player's Contract provides in part:

"4. (a) . . . The Player agrees that, in addition to other remedies, the Club shall be entitled to injunctive and other equitable relief to prevent a breach of this contract by the Player, including, among others, the right to enjoin the Player from playing baseball for any other person or organization during the term of this contract."

"5. (a). The Player agrees that, while under contract, and prior to expiration of the Club's right to renew this contract, he will not play baseball otherwise than for the Club, except that the Player may participate in post-season games under the conditions prescribed in the Major League Rules. . . ."

"6. (a) The Player agrees that this contract may be assigned by the Club (and reassigned by any assignee Club) to any other Club in accordance with the Major League Rules and the Professional Baseball Rules."

"10. (a) On or before January 15 (or if a Sunday, then the next preceding business day) of the year next following the last playing season covered by this contract, the Club may tender to the Player a contract for the term of that year by mailing the same to the Player at his address following his signature hereto, or if none be given, then at his last address of record with the Club. If prior to the March 1 next succeeding said January 15, the Player and the Club have not agreed upon the terms of such contract, then on or before 10 days after said March 1, the Club shall have the right by written notice to the Player at said address to renew this contract for the period of one year on the same terms, except that the amount payable to the Player shall be such as the club shall fix in said notice; provided, however, that said amount, if fixed by

Elysian Fields June 19, 1846, with Alexander Jay Cart-wright as the instigator and the umpire. The teams were amateur, but the contest marked a significant date in baseball's beginnings. That early game led ultimately to the development of professional baseball and its tightly organized structure.

The Cincinnati Red Stockings came into existence in 1869 upon an outpouring of local pride. With only one Cincinnatian on the payroll, this professional team traveled over 11,000 miles that summer, winning 56 games and tying one. Shortly thereafter, on St. Patrick's Day in 1871, the National Association of Professional Baseball Players was founded and the professional league was born.

The ensuing colorful days are well known. The ardent follower and the student of baseball know of General Abner Doubleday; the formation of the National League in 1876; Chicago's supremacy in the first year's competition under the leadership of Al Spalding and with Cap Anson at third base; the formation of the American Association and then of the Union Association in the 1880's; the introduction of Sunday baseball; interleague warfare with cut-rate admission prices and player raiding; the development of the reserve "clause"; the emergence in 1885 of the Brotherhood of Professional Ball Players, and in 1890 of the Players League; the appearance of the American League, or "junior circuit," in 1901, rising from the minor Western Association; the first World

a Major League Club, shall be an amount payable at a rate not less than 80% of the rate stipulated for the preceding year.

"(b) The Club's right to renew this contract, as provided in subparagraph (a) of this paragraph 10, and the promise of the Player not to play otherwise than with the Club have been taken into consideration in determining the amount payable under paragraph 2 hereof."

Series in 1903, disruption in 1904, and the Series' resumption in 1905; the short-lived Federal League on the majors' scene during World War I years; the troublesome and discouraging episode of the 1919 Series; the home run ball; the shifting of franchises; the expansion of the leagues; the installation in 1965 of the major league draft of potential new players; and the formation of the Major League Baseball Players Association in 1966.[2]

Then there are the many names, celebrated for one reason or another, that have sparked the diamond and its environs and that have provided tinder for recaptured thrills, for reminiscence and comparisons, and for conversation and anticipation in-season and off-season: Ty Cobb, Babe Ruth, Tris Speaker, Walter Johnson, Henry Chadwick, Eddie Collins, Lou Gehrig, Grover Cleveland Alexander, Rogers Hornsby, Harry Hooper, Goose Goslin, Jackie Robinson, Honus Wagner, Joe McCarthy, John McGraw, Deacon Phillippe, Rube Marquard, Christy Mathewson, Tommy Leach, Big Ed Delahanty, Davy Jones, Germany Schaefer, King Kelly, Big Dan Brouthers, Wahoo Sam Crawford, Wee Willie Keeler, Big Ed Walsh, Jimmy Austin, Fred Snodgrass, Satchel Paige, Hugh Jennings, Fred Merkle, Iron Man McGinnity, Three-Finger Brown, Harry and Stan Coveleski, Connie Mack, Al Bridwell, Red Ruffing, Amos Rusie, Cy Young, Smokey Joe Wood, Chief Meyers, Chief Bender, Bill Klem, Hans Lobert, Johnny Evers, Joe Tinker, Roy Campanella, Miller Huggins, Rube Bressler, Dazzy Vance, Edd Roush, Bill Wambsganss, Clark Griffith, Branch Rickey, Frank Chance, Cap Anson,

---

[2] See generally The Baseball Encyclopedia (1969); L. Ritter, The Glory of Their Times (1966); 1 & 2 H. Seymour, Baseball (1960, 1971); 1 & 2 D. Voigt, American Baseball (1966, 1970).

Nap Lajoie, Sad Sam Jones, Bob O'Farrell, Lefty O'Doul, Bobby Veach, Willie Kamm, Heinie Groh, Lloyd and Paul Waner, Stuffy McInnis, Charles Comiskey, Roger Bresnahan, Bill Dickey, Zack Wheat, George Sisler, Charlie Gehringer, Eppa Rixey, Harry Heilmann, Fred Clarke, Dizzy Dean, Hank Greenberg, Pie Traynor, Rube Waddell, Bill Terry, Carl Hubbell, Old Hoss Radbourne, Moe Berg, Rabbit Maranville, Jimmie Foxx, Lefty Grove.[3] The list seems endless.

And one recalls the appropriate reference to the "World Serious," attributed to Ring Lardner, Sr.; Ernest L. Thayer's "Casey at the Bat"; [4] the ring of "Tinker to

---

[3] These are names only from earlier years. By mentioning some, one risks unintended omission of others equally celebrated.

[4] Millions have known and enjoyed baseball. One writer knowledgeable in the field of sports almost assumed that everyone did until, one day, he discovered otherwise:

"I knew a cove who'd never heard of Washington and Lee,
Of Caesar and Napoleon from the ancient jamboree,
But, bli'me, there are queerer things than anything like that,
For here's a cove who never heard of 'Casey at the Bat'!

"Ten million never heard of Keats, or Shelley, Burns or Poe;
But they know 'the air was shattered by the force of Casey's blow';
They never heard of Shakespeare, nor of Dickens, like as not,
But they know the somber drama from old Mudville's haunted lot.

"He never heard of Casey! Am I dreaming? Is it true?
Is fame but windblown ashes when the summer day is through?
Does greatness fade so quickly and is grandeur doomed to die
That bloomed in early morning, ere the dusk rides down the sky?"

"He Never Heard of Casey" Grantland Rice, The Sportlight, New York Herald Tribune, June 1, 1926, p. 23.

Evers to Chance"; [5] and all the other happenings, habits, and superstitions about and around baseball that made it the "national pastime" or, depending upon the point of view, "the great American tragedy." [6]

## II

## The Petitioner

The petitioner, Curtis Charles Flood, born in 1938, began his major league career in 1956 when he signed a contract with the Cincinnati Reds for a salary of $4,000 for the season. He had no attorney or agent to advise him on that occasion. He was traded to the St. Louis Cardinals before the 1958 season. Flood rose to fame as a center fielder with the Cardinals during the years 1958–1969. In those 12 seasons he compiled a batting average of .293. His best offensive season was 1967 when he achieved .335. He was .301 or better in six of the 12 St. Louis years. He participated in the 1964, 1967, and 1968 World Series. He played errorless ball in the field in 1966, and once enjoyed 223 consecutive errorless games. Flood has received seven Golden Glove Awards. He was co-captain of his team from 1965–1969. He ranks among the 10 major league outfielders possessing the highest lifetime fielding averages.

---

[5] "These are the saddest of possible words,
 'Tinker to Evers to Chance.'
 Trio of bear cubs, and fleeter than birds,
 'Tinker to Evers to Chance.'
 Ruthlessly pricking our gonfalon bubble,
 Making a Giant hit into a double—
 Words that are weighty with nothing but trouble:
 'Tinker to Evers to Chance.'"
Franklin Pierce Adams, Baseball's Sad Lexicon.

[6] George Bernard Shaw, The Sporting News, May 27, 1943, p. 15, col. 4.

Flood's St. Louis compensation for the years shown was:

| 1961 | $13,500 (including a bonus for signing) |
|------|------|
| 1962 | $16,000 |
| 1963 | $17,500 |
| 1964 | $23,000 |
| 1965 | $35,000 |
| 1966 | $45,000 |
| 1967 | $50,000 |
| 1968 | $72,500 |
| 1969 | $90,000 |

These figures do not include any so-called fringe benefits or World Series shares.

But at the age of 31, in October 1969, Flood was traded to the Philadelphia Phillies of the National League in a multi-player transaction. He was not consulted about the trade. He was informed by telephone and received formal notice only after the deal had been consummated. In December he complained to the Commissioner of Baseball and asked that he be made a free agent and be placed at liberty to strike his own bargain with any other major league team. His request was denied.

Flood then instituted this antitrust suit [7] in January 1970 in federal court for the Southern District of New York. The defendants (although not all were named in each cause of action) were the Commissioner of Baseball, the presidents of the two major leagues, and the 24 major league clubs. In general, the complaint charged violations of the federal antitrust laws and civil rights statutes, violation of state statutes and the common law, and the imposition of a form of peonage and involuntary

---

[7] Concededly supported by the Major League Baseball Players Association, the players' collective-bargaining representative. Tr. of Oral Arg. 12.

servitude contrary to the Thirteenth Amendment and 42 U. S. C. § 1994, 18 U. S. C. § 1581, and 29 U. S. C. §§ 102 and 103. Petitioner sought declaratory and injunctive relief and treble damages.

Flood declined to play for Philadelphia in 1970, despite a $100,000 salary offer, and he sat out the year. After the season was concluded, Philadelphia sold its rights to Flood to the Washington Senators. Washington and the petitioner were able to come to terms for 1971 at a salary of $110,000.[8] Flood started the season but, apparently because he was dissatisfied with his performance, he left the Washington club on April 27, early in the campaign. He has not played baseball since then.

## III

### The Present Litigation

Judge Cooper, in a detailed opinion, first denied a preliminary injunction, 309 F. Supp. 793 (SDNY 1970), observing on the way:

> "Baseball has been the national pastime for over one hundred years and enjoys a unique place in our American heritage. Major league professional baseball is avidly followed by millions of fans, looked upon with fervor and pride and provides a special source of inspiration and competitive team spirit especially for the young.

> "Baseball's status in the life of the nation is so pervasive that it would not strain credulity to say the Court can take judicial notice that baseball is everybody's business. To put it mildly and with restraint, it would be unfortunate indeed if a fine sport and profession, which brings surcease from daily travail and an escape from the ordinary to

---

[8] The parties agreed that Flood's participating in baseball in 1971 would be without prejudice to his case.

most inhabitants of this land, were to suffer in
the least because of undue concentration by any
one or any group on commercial and profit con-
siderations. The game is on higher ground; it
behooves every one to keep it there." 309 F. Supp.,
at 797.

Flood's application for an early trial was granted. The
court next deferred until trial its decision on the de-
fendants' motions to dismiss the primary causes of action,
but granted a defense motion for summary judgment on
an additional cause of action. 312 F. Supp. 404 (SDNY
1970).

Trial to the court took place in May and June 1970.
An extensive record was developed. In an ensuing
opinion, 316 F. Supp. 271 (SDNY 1970), Judge Cooper
first noted that:

"Plaintiff's witnesses in the main concede that
some form of reserve on players is a necessary ele-
ment of the organization of baseball as a league
sport, but contend that the present all-embracing
system is needlessly restrictive and offer various
alternatives which in their view might loosen the
bonds without sacrifice to the game. . . .

"Clearly the preponderance of credible proof does
not favor elimination of the reserve clause. With
the sole exception of plaintiff himself, it shows that
even plaintiff's witnesses do not contend that it is
wholly undesirable; in fact they regard substantial
portions meritorious. . . ." 316 F. Supp., at 275–276.

He then held that *Federal Baseball Club* v. *National
League,* 259 U. S. 200 (1922), and *Toolson* v. *New York
Yankees, Inc.,* 346 U. S. 356 (1953), were controlling; that
it was not necessary to reach the issue whether exemption
from the antitrust laws would result because aspects of

baseball now are a subject of collective bargaining; that the plaintiff's state-law claims, those based on common law as well as on statute, were to be denied because baseball was not "a matter which admits of diversity of treatment," 316 F. Supp., at 280; that the involuntary servitude claim failed because of the absence of "the essential element of this cause of action, a showing of compulsory service," 316 F. Supp., at 281–282; and that judgment was to be entered for the defendants. Judge Cooper included a statement of personal conviction to the effect that "negotiations could produce an accommodation on the reserve system which would be eminently fair and equitable to all concerned" and that "the reserve clause can be fashioned so as to find acceptance by player and club." 316 F. Supp., at 282 and 284.

On appeal, the Second Circuit felt "compelled to affirm." 443 F. 2d 264, 265 (1971). It regarded the issue of state law as one of first impression, but concluded that the Commerce Clause precluded its application. Judge Moore added a concurring opinion in which he predicted, with respect to the suggested overruling of *Federal Baseball* and *Toolson*, that "there is no likelihood that such an event will occur."[9] 443 F. 2d, at 268, 272.

---

[9] "And properly so. Baseball's welfare and future should not be for politically insulated interpreters of technical antitrust statutes but rather should be for the voters through their elected representatives. If baseball is to be damaged by statutory regulation, let the congressman face his constituents the next November and also face the consequences of his baseball voting record." 443 F. 2d, at 272.

Cf. Judge Friendly's comments in *Salerno* v. *American League,* 429 F. 2d 1003, 1005 (CA2 1970), cert. denied, *sub nom. Salerno* v. *Kuhn,* 400 U. S. 1001 (1971):

"We freely acknowledge our belief that *Federal Baseball* was not one of Mr. Justice Holmes' happiest days, that the rationale of *Toolson* is extremely dubious and that, to use the Supreme Court's

We granted certiorari in order to look once again at this troublesome and unusual situation. 404 U. S. 880 (1971):

## IV

## The Legal Background

A. *Federal Baseball Club* v. *National League*, 259 U. S. 200 (1922), was a suit for treble damages instituted by a member of the Federal League (Baltimore) against the National and American Leagues and others. The plaintiff obtained a verdict in the trial court, but the Court of Appeals reversed. The main brief filed by the plaintiff with this Court discloses that it was strenuously argued, among other things, that the business in which the defendants were engaged was interstate commerce; that the interstate relationship among the several clubs, located as they were in different States, was predominant; that organized baseball represented an investment of colossal wealth; that it was an engagement in moneymaking; that gate receipts were divided by agreement between the home club and the visiting club; and that the business of baseball was to be distinguished from the mere playing of the game as a sport for physical exercise and diversion. See also 259 U. S., at 201–206.

Mr. Justice Holmes, in speaking succinctly for a unanimous Court, said:

> "The business is giving exhibitions of base ball, which are purely state affairs. . . . But the fact that in order to give the exhibitions the Leagues must induce free persons to cross state lines and

---

own adjectives, the distinction between baseball and other professional sports is 'unrealistic,' 'inconsistent' and 'illogical.'. . . While we should not fall out of our chairs with surprise at the news that *Federal Baseball* and *Toolson* had been overruled, we are not at all certain the Court is ready to give them a happy despatch."

must arrange and pay for their doing so is not enough to change the character of the business. . . . [T]he transport is a mere incident, not the essential thing. That to which it is incident, the exhibition, although made for money would not be called trade or commerce in the commonly accepted use of those words. As it is put by the defendants, personal effort, not related to production, is not a subject of commerce. That which in its consummation is not commerce does not become commerce among the States because the transportation that we have mentioned takes place. To repeat the illustrations given by the Court below, a firm of lawyers sending out a member to argue a case, or the Chautauqua lecture bureau sending out lecturers, does not engage in such commerce because the lawyer or lecturer goes to another State.

"If we are right the plaintiff's business is to be described in the same way and the restrictions by contract that prevented the plaintiff from getting players to break their bargains and the other conduct charged against the defendants were not an interference with commerce among the States." 259 U. S., at 208–209.[10]

---

[10] "What really saved baseball, legally at least, for the next half century was the protective canopy spread over it by the United States Supreme Court's decision in the Baltimore Federal League anti-trust suit against Organized Baseball in 1922. In it Justice Holmes, speaking for a unanimous court, ruled that the business of giving baseball exhibitions for profit was not 'trade or commerce in the commonly-accepted use of those words' because 'personal effort, not related to production, is not a subject of commerce'; nor was it interstate, because the movement of ball clubs across state lines was merely 'incidental' to the business. It should be noted that, contrary to what many believe, Holmes did call baseball a business; time and again those who have not troubled to read the text of the decision have claimed incorrectly that the court said baseball was a sport and not a business." 2 H. Seymour, Baseball 420 (1971).

The Court thus chose not to be persuaded by opposing examples proffered by the plaintiff, among them (a) Judge Learned Hand's decision on a demurrer to a Sherman Act complaint with respect to vaudeville entertainers traveling a theater circuit covering several States, *H. B. Marienelli, Ltd.* v. *United Booking Offices,* 227 F. 165 (SDNY 1914); (b) the first Mr. Justice Harlan's opinion in *International Textbook Co.* v. *Pigg,* 217 U. S. 91 (1910), to the effect that correspondence courses pursued through the mail constituted commerce among the States; and (c) Mr. Justice Holmes' own opinion, for another unanimous Court, on demurrer in a Sherman Act case, relating to cattle shipment, the interstate movement of which was interrupted for the finding of purchasers at the stockyards, *Swift & Co.* v. *United States,* 196 U. S. 375 (1905). The only earlier case the parties were able to locate where the question was raised whether organized baseball was within the Sherman Act was *American League Baseball Club* v. *Chase,* 86 Misc. 441, 149 N. Y. S. 6 (1914). That court had answered the question in the negative.

B. *Federal Baseball* was cited a year later, and without disfavor, in another opinion by Mr. Justice Holmes for a unanimous Court. The complaint charged antitrust violations with respect to vaudeville bookings. It was held, however, that the claim was not frivolous and that the bill should not have been dismissed. *Hart* v. *B. F. Keith Vaudeville Exchange,* 262 U. S. 271 (1923).[11]

It has also been cited, not unfavorably, with respect to the practice of law, *United States* v. *South-Eastern*

---

[11] On remand of the *Hart* case the trial court dismissed the complaint at the close of the evidence. The Second Circuit affirmed on the ground that the plaintiff's evidence failed to establish that the interstate transportation was more than incidental. 12 F. 2d 341 (1926). This Court denied certiorari, 273 U. S. 703 (1926).

*Underwriters Assn.*, 322 U. S. 533, 573 (1944) (Stone, C. J., dissenting); with respect to out-of-state contractors, *United States* v. *Employing Plasterers Assn.*, 347 U. S. 186, 196–197 (1954) (Minton, J., dissenting); and upon a general comparison reference, *North American Co.* v. *SEC*, 327 U. S. 686, 694 (1946).

In the years that followed, baseball continued to be subject to intermittent antitrust attack. The courts, however, rejected these challenges on the authority of *Federal Baseball*. In some cases stress was laid, although unsuccessfully, on new factors such as the development of radio and television with their substantial additional revenues to baseball.[12] For the most part, however, the Holmes opinion was generally and necessarily accepted as controlling authority.[13] And in the 1952 Report of the Subcommittee on Study of Monopoly Power of the House Committee on the Judiciary, H. R. Rep. No. 2002, 82d Cong., 2d Sess., 229, it was said, in conclusion:

> "On the other hand the overwhelming preponderance of the evidence established baseball's need for some sort of reserve clause. Baseball's history shows that chaotic conditions prevailed when there was no reserve clause. Experience points to no feasible substitute to protect the integrity of the game or to guarantee a comparatively even com-

---

[12] *Toolson* v. *New York Yankees, Inc.*, 101 F. Supp. 93 (SD Cal. 1951), aff'd, 200 F. 2d 198 (CA9 1952); *Kowalski* v. *Chandler*, 202 F. 2d 413 (CA6 1953). See *Salerno* v. *American League*, 429 F. 2d 1003 (CA2 1970), cert. denied, *sub nom. Salerno* v. *Kuhn*, 400 U. S. 1001 (1971). But cf. *Gardella* v. *Chandler*, 172 F. 2d 402 (CA2 1949) (this case, we are advised, was subsequently settled); *Martin* v. *National League Baseball Club*, 174 F. 2d 917 (CA2 1949).

[13] *Corbett* v. *Chandler*, 202 F. 2d 428 (CA6 1953); *Portland Baseball Club, Inc.* v. *Baltimore Baseball Club, Inc.*, 282 F. 2d 680 (CA9 1960); *Niemiec* v. *Seattle Rainier Baseball Club, Inc.*, 67 F. Supp. 705 (WD Wash. 1946). See *State* v. *Milwaukee Braves, Inc.*, 31 Wis. 2d 699, 144 N. W. 2d 1, cert. denied, 385 U. S. 990 (1966).

petitive struggle. The evidence adduced at the hearings would clearly not justify the enactment of legislation flatly condemning the reserve clause."

. C. The Court granted certiorari, 345 U. S. 963 (1953), in the *Toolson, Kowalski,* and *Corbett* cases, cited in nn. 12 and 13, *supra,* and, by a short *per curiam* (Warren, C. J., and Black, Frankfurter, DOUGLAS, Jackson, Clark, .and Minton, JJ.), affirmed the judgments of the respective courts of appeals in those three cases. *Toolson* v. *New. York Yankees, Inc.,* 346 U. S. 356 (1953). *Federal Baseball* was cited as holding "that the business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws," 346 U. S., at 357, and:

> "Congress has had the ruling under consideration but has not seen fit to bring such business under these laws by legislation having prospective effect. The business has thus been left for thirty years to develop, on the understanding that it was not subject to existing antitrust legislation. The present cases ask us to overrule the prior decision and, with retrospective effect, hold the legislation applicable. We think that if there are evils in this . field which now warrant application to it of the antitrust laws it should be by legislation. Without re-examination of the underlying issues, the judgments below. are affirmed on the authority of *Federal Baseball Club of Baltimore* v. *National League of Professional Baseball Clubs, supra,* so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." *Ibid.*

This quotation reveals four reasons for the Court's affirmance of *Toolson* and its companion cases: (a) Congressional awareness for three decades of the. Court's ruling in *Federal Baseball,* coupled with congressional

inaction. (b) The fact that baseball was left alone to develop for that period upon the understanding that the reserve system was not subject to existing federal antitrust laws. (c) A reluctance to overrule *Federal Baseball* with consequent retroactive effect. (d) A professed desire that any needed remedy be provided by legislation rather than by court decree. The emphasis in *Toolson* was on the determination, attributed even to *Federal Baseball*, that Congress had no intention to include baseball within the reach of the federal antitrust laws. Two Justices (Burton and Reed, JJ.) dissented, stressing the factual aspects, revenue sources, and the absence of an express exemption of organized baseball from the Sherman Act. 346 U. S., at 357. The 1952 congressional study was mentioned. *Id.*, at 358, 359, 361.

It is of interest to note that in *Toolson* the petitioner had argued flatly that *Federal Baseball* "is wrong and must be overruled," Brief for Petitioner, No. 18, O. T. 1953, p. 19, and that Thomas Reed Powell, a constitutional scholar of no small stature, urged, as counsel for an *amicus*, that "baseball is a unique enterprise," Brief for Boston American League Base Ball Co. as Amicus Curiae 2, and that "unbridled competition as applied to baseball would not be in the public interest." *Id.*, at 14.

D. *United States* v. *Shubert*, 348 U. S. 222 (1955), was a civil antitrust action against defendants engaged in the production of legitimate theatrical attractions throughout the United States and in operating theaters for the presentation of such attractions. The District Court had dismissed the complaint on the authority of *Federal Baseball* and *Toolson*. 120 F. Supp. 15 (SDNY 1953). This Court reversed. Mr. Chief Justice Warren noted the Court's broad conception of "trade or commerce" in the antitrust statutes and the types of enterprises already held to be within the reach of that phrase.

He stated that *Federal Baseball* and *Toolson* afforded no basis for a conclusion that businesses built around the performance of local exhibitions are exempt from the antitrust laws. 348 U. S., at 227. He then went on to elucidate the holding in *Toolson* by meticulously spelling out the factors mentioned above:

"In *Federal Baseball*, the Court, speaking through Mr. Justice Holmes, was dealing with the business of baseball and nothing else. . . . The travel, the Court concluded, was 'a mere incident, not the essential thing.' . . .

. . . . .

"In *Toolson*, where the issue was the same as in *Federal Baseball*, the Court was confronted with a unique combination of circumstances. For over 30 years there had stood a decision of this Court specifically fixing the status of the baseball business under the antitrust laws and more particularly the validity of the so-called 'reserve clause.' During this period, in reliance on the *Federal Baseball* precedent, the baseball business had grown and developed. . . . And Congress, although it had actively considered the ruling, had not seen fit to reject it by amendatory legislation. Against this background, the Court in *Toolson* was asked to overrule *Federal Baseball* on the ground that it was out of step with subsequent decisions reflecting present-day concepts of interstate commerce. The Court, in view of the circumstances of the case, declined to do so. But neither did the Court necessarily reaffirm all that was said in *Federal Baseball*. Instead, '[w]ithout re-examination of the underlying issues,' the Court adhered to *Federal Baseball* 'so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws.' 346

U. S., at 357. In short, *Toolson* was a narrow application of the rule of *stare decisis*.

"... If the *Toolson* holding is to be expanded—or contracted—the appropriate remedy lies with Congress." 348 U. S., at 228–230.

E. *United States* v. *International Boxing Club*, 348 U. S. 236 (1955), was a companion to *Shubert* and was decided the same day. This was a civil antitrust action against defendants engaged in the business of promoting professional championship boxing contests. Here again the District Court had dismissed the complaint in reliance upon *Federal Baseball* and *Toolson*. The Chief Justice observed that "if it were not for *Federal Baseball* and *Toolson*, we think that it would be too clear for dispute that the Government's allegations bring the defendants within the scope of the Act." 348 U. S., at 240–241. He pointed out that the defendants relied on the two baseball cases but also would have been content with a more restrictive interpretation of them than the *Shubert* defendants, for the boxing defendants argued that the cases immunized only businesses that involve exhibitions of an athletic nature. The Court accepted neither argument. It again noted, 348 U. S., at 242, that "*Toolson* neither overruled *Federal Baseball* nor necessarily reaffirmed all that was said in *Federal Baseball*." It stated:

> "The controlling consideration in *Federal Baseball* and *Hart* was, instead, a very practical one— the degree of interstate activity involved in the particular business under review. It follows that *stare decisis* cannot help the defendants here; for, contrary to their argument, *Federal Baseball* did not hold that all businesses based on professional sports were outside the scope of the antitrust laws. The issue confronting us is, therefore, not whether a previously granted exemption should continue,

but whether an exemption should be granted in the first instance. And that issue is for Congress to resolve, not this Court." 348 U. S., at 243.

The Court noted the presence then in Congress of various bills forbidding the application of the antitrust laws to "organized professional sports enterprises"; the holding of extensive hearings on some of these; subcommittee opposition; a postponement recommendation as to baseball; and the fact that "Congress thus left intact the then-existing coverage of the antitrust laws." 348 U. S., at 243–244.

Mr. Justice Frankfurter, joined by Mr. Justice Minton, dissented. "It would baffle the subtlest ingenuity," he said, "to find a single differentiating factor between other sporting exhibitions . . . and baseball insofar as the conduct of the sport is relevant to the criteria or considerations by which the Sherman Law becomes applicable to a 'trade or commerce.' " 348 U. S., at 248. He went on:

> "The Court decided as it did in the *Toolson* case as an application of the doctrine of *stare decisis*. That doctrine is not, to be sure, an imprisonment of reason. But neither is it a whimsy. It can hardly be that this Court gave a preferred position to baseball because it is the great American sport. . . . If *stare decisis* be one aspect of law, as it is, to disregard it in identic situations is mere caprice.
>
> "Congress, on the other hand, may yield to sentiment and be capricious, subject only to due process. . . .
>
> "Between them, this case and *Shubert* illustrate that nice but rational distinctions are inevitable in adjudication. I agree with the Court's opinion in *Shubert* for precisely the reason that constrains me to dissent in this case." 348 U. S., at 249–250.

Mr. Justice Minton also separately dissented on the ground that boxing is not trade or commerce. He added the comment that "Congress has not attempted" to control baseball and boxing. 348 U. S., at 251, 253. The two dissenting Justices, thus, did not call for the overruling of *Federal Baseball* and *Toolson;* they merely felt that boxing should be under the same umbrella of freedom as was baseball and, as Mr. Justice Frankfurter said, 348 U. S., at 250, they could not exempt baseball "to the exclusion of every other sport different not one legal jot or tittle from it." [14]

F. The parade marched on. *Radovich* v. *National Football League,* 352 U. S. 445 (1957), was a civil Clayton Act case testing the application of the antitrust laws to professional football. The District Court dismissed. The Ninth Circuit affirmed in part on the basis of *Federal Baseball* and *Toolson.* The court did not hesitate to "confess that the strength of the pull" of the baseball cases and of *International Boxing* "is about equal," but then observed that "[f]ootball is a team sport" and boxing an individual one. 231 F. 2d 620, 622.

This Court reversed with an opinion by Mr. Justice Clark. He said that the Court made its ruling in *Toolson* "because it was concluded that more harm would be done in overruling *Federal Baseball* than in upholding a ruling which at best was of dubious validity." 352 U. S., at 450. He noted that Congress had not acted. He then said:

"All this, combined with the flood of litigation that would follow its repudiation, the harassment that would ensue, and the retroactive effect of such a decision, led the Court to the practical result that

---

[14] The case's final chapter is *International Boxing Club* v. *United States,* 358 U. S. 242 (1959).

it should sustain the unequivocal line of authority reaching over many years.

"[S]ince *Toolson* and *Federal Baseball* are still cited as controlling authority in antitrust actions involving other fields of business, we now specifically limit the rule there established to the facts there involved, *i. e.,* the business of organized professional baseball. As long as the Congress continues to acquiesce we should adhere to—but not extend—the interpretation of the Act made in those cases. . . .

"If this ruling is unrealistic, inconsistent, or illogical, it is sufficient to answer, aside from the distinctions between the businesses, that were we considering the question of baseball for the first time upon a clean slate we would have no doubts. But *Federal Baseball* held the business of baseball outside the scope of the Act. No other business claiming the coverage of those cases has such an adjudication. We, therefore, conclude that the orderly way to eliminate error or discrimination, if any there be, is by legislation and not by court decision. Congressional processes are more accommodative, affording the whole industry hearings and an opportunity to assist in the formulation of new legislation. The resulting product is therefore more likely to protect the industry and the public alike. The whole scope of congressional action would be known long in advance and effective dates for the legislation could be set in the future without the injustices of retroactivity and surprise which might follow court action." 352 U. S., at 450–452 (footnote omitted).

Mr. Justice Frankfurter dissented essentially for the reasons stated in his dissent in *International Boxing,*

352 U. S., at 455. Mr. Justice Harlan, joined by MR. JUSTICE BRENNAN, also dissented because he, too, was "unable to distinguish football from baseball." 352 U. S., at 456. Here again the dissenting Justices did not call for the overruling of the baseball decisions. They merely could not distinguish the two sports and, out of respect for *stare decisis,* voted to affirm.

G. Finally, in *Haywood* v. *National Basketball Assn.,* 401 U. S. 1204 (1971), MR. JUSTICE DOUGLAS, in his capacity as Circuit Justice, reinstated a District Court's injunction *pendente lite* in favor of a professional basketball player and said, "Basketball . . . . does not enjoy exemption from the antitrust laws." 401 U. S., at 1205.[15]

H. This series of decisions understandably spawned extensive commentary,[16] some of it mildly critical and

---

[15] See also *Denver Rockets* v. *All-Pro Management, Inc.,* 325 F. Supp. 1049, 1060 (CD Cal. 1971); *Washington Professional Basketball Corp.* v. *National Basketball Assn.,* 147 F. Supp. 154 (SDNY 1956).

[16] Neville, Baseball and the Antitrust Laws, 16 Fordham L. Rev. 208 (1947); Eckler, Baseball—Sport or Commerce?, 17 U. Chi. L. Rev. 56 (1949); Comment, Monopsony in Manpower: Organized Baseball Meets the Antitrust Laws, 62 Yale L. J. 576 (1953); P. Gregory, The Baseball Player, An Economic Study, c. 19 (1956); Note, The Super Bowl and the Sherman Act: Professional Team Sports and the Antitrust Laws, 81 Harv. L. Rev. 418 (1967); The Supreme Court, 1953 Term, 68 Harv. L. Rev. 105, 136–138 (1954); The Supreme Court, 1956 Term, 71 Harv. L. Rev. 94, 170–173 (1957); Note, 32 Va. L. Rev. 1164 (1946); Note, 24 Notre Dame Law. 372 (1949); Note, 53 Col. L. Rev. 242 (1953); Note, 22 U. Kan. City L. Rev. 173 (1954); Note, 25 Miss. L. J. 270 (1954); Note, 29 N. Y. U. L. Rev. 213 (1954); Note, 105 U. Pa. L. Rev. 110 (1956); Note, 32 Texas L. Rev. 890 (1954); Note, 35 B. U. L. Rev. 447 (1955); Note, 57 Col. L. Rev. 725 (1957); Note, 23 Geo. Wash. L. Rev. 606 (1955); Note, 1 How. L. J. 281 (1955); Note, 26 Miss. L. J. 271 (1955); Note, 9 Sw. L. J. 369 (1955); Note, 29 Temple L. Q. 103 (1955); Note, 29 Tul. L. Rev. 793 (1955); Note, 62 Dick.

much of it not; nearly all of it looked to Congress for any remedy that might be deemed essential.

I. Legislative proposals have been numerous and persistent. Since *Toolson* more than 50 bills have been introduced in Congress relative to the applicability or nonapplicability of the antitrust laws to baseball.[17] A few of these passed one house or the other. Those that did would have expanded, not restricted, the reserve system's exemption to other professional league sports. And the Act of Sept. 30, 1961, Pub. L. 87–331, 75 Stat. 732, and the merger addition thereto effected by the Act of Nov. 8, 1966, Pub. L. 89–800, § 6 (b),

---

L. Rev. 96 (1957); Note, 11 Sw. L. J. 516 (1957); Note, 36 N. C. L. Rev. 315 (1958); Note, 35 Fordham L. Rev. 350 (1966); Note, 8 B. C. Ind. & Com. L. Rev. 341 (1967); Note, 13 Wayne L. Rev. 417 (1967); Note, 2 Rutgers-Camden L. J. 302 (1970); Note, 8 San Diego L. Rev. 92 (1970); Note, 12 B. C. Ind. & Com. L. Rev. 737 (1971); Note, 12 Wm. & Mary L. Rev. 859 (1971).

[17] Hearings on H. R. 5307 et al. before the Antitrust Subcommittee of the House Committee on the Judiciary, 85th Cong., 1st Sess. (1957); Hearings on H. R. 10378 and S. 4070 before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 85th Cong., 2d Sess. (1958); Hearings on H. R. 2370 et al. before the Antitrust Subcommittee of the House Committee on the Judiciary, 86th Cong., 1st Sess. (1959) (not printed); Hearings on S. 616 and S. 886 before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 86th Cong., 1st Sess. (1959); Hearings on S. 3483 before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 86th Cong., 2d Sess. (1960); Hearings on S. 2391 before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 88th Cong., 2d Sess. (1964); S. Rep. No. 1303, 88th Cong., 2d Sess. (1964); Hearings on S. 950 before the Subcommittee on Antitrust and Monopoly of the Senate Committee on the Judiciary, 89th Cong., 1st Sess. (1965); S. Rep. No. 462, 89th Cong., 1st Sess. (1965). Bills introduced in the 92d Cong., 1st Sess., and bearing on the subject are S. 2599, S. 2616, H. R. 2305, H. R. 11033, and H. R. 10825.

80 Stat. 1515, 15 U. S. C. §§ 1291–1295, were also expansive rather than restrictive as to antitrust exemption.[18]

## V

In view of all this, it seems appropriate now to say that:

1. Professional baseball is a business and it is engaged in interstate commerce.

2. With its reserve system enjoying exemption from the federal antitrust laws, baseball is, in a very distinct sense, an exception and an anomaly. *Federal Baseball* and *Toolson* have become an aberration confined to baseball.

3. Even though others might regard this as "unrealistic, inconsistent, or illogical," see *Radovich*, 352 U. S., at 452, the aberration is an established one, and one that has been recognized not only in *Federal Baseball* and *Toolson*, but in *Shubert*, *International Boxing*, and *Radovich*, as well, a total of five consecutive cases in this Court. It is an aberration that has been with us now for half a century, one heretofore deemed fully entitled to the benefit of *stare decisis*, and one that has survived the Court's expanding concept of interstate commerce. It rests on a recognition and an acceptance of baseball's unique characteristics and needs.

4. Other professional sports operating interstate—foot-

---

[18] Title 15 U. S. C. § 1294 reads:

"Nothing contained in this chapter shall be deemed to change, determine, or otherwise affect the *applicability* or *nonapplicability* of the antitrust laws to any act, contract, agreement, rule, course of conduct, or other activity by, between, or among persons engaging in, conducting, or participating in the organized professional team sports of football, baseball, basketball, or hockey, except the agreements to which section 1291 of this title shall apply." (Emphasis supplied.)

ball, boxing, basketball, and, presumably, hockey[19] and golf[20]—are not so exempt.

5. The advent of radio and television, with their consequent increased coverage and additional revenues, has not occasioned an overruling of *Federal Baseball* and *Toolson.*

6. The Court has emphasized that since 1922 baseball, with full and continuing congressional awareness, has been allowed to develop and to expand unhindered by federal legislative action. Remedial legislation has been introduced repeatedly in Congress but none has ever been enacted. The Court, accordingly, has concluded that Congress as yet has had no intention to subject baseball's reserve system to the reach of the antitrust statutes. This, obviously, has been deemed to be something other than mere congressional silence and passivity. Cf. *Boys Markets, Inc.* v. *Retail Clerks Union,* 398 U. S. 235, 241–242 (1970).

7. The Court has expressed concern about the confusion and the retroactivity problems that inevitably would result with a judicial overturning of *Federal Baseball.* It has voiced a preference that if any change is to be made, it come by legislative action that, by its nature, is only prospective in operation.

8. The Court noted in *Radovich,* 352 U. S., at 452, that the slate with respect to baseball is not clean. Indeed, it has not been clean for half a century.

This emphasis and this concern are still with us. We continue to be loath, 50 years after *Federal Baseball* and almost two decades after *Toolson,* to overturn those cases judicially when Congress, by its positive inaction,

---

[19] *Peto* v. *Madison Square Garden Corp.,* 1958 Trade Cases, ¶ 69,106 (SDNY 1958).

[20] *Deesen* v. *Professional Golfers' Assn.,* 358 F. 2d 165 (CA9), cert. denied, 385 U. S. 846 (1966).

has allowed those decisions to stand for so long and, far beyond mere inference and implication, has clearly evinced a desire not to disapprove them legislatively.

Accordingly, we adhere once again to *Federal Baseball* and *Toolson* and to their application to professional baseball. We adhere also to *International Boxing* and *Radovich* and to their respective applications to professional boxing and professional football. If there is any inconsistency or illogic in all this, it is an inconsistency and illogic of long standing that is to be remedied by the Congress and not by this Court. If we were to act otherwise, we would be withdrawing from the conclusion as to congressional intent made in *Toolson* and from the concerns as to retrospectivity therein expressed. Under these circumstances, there is merit in consistency even though some might claim that beneath that consistency is a layer of inconsistency.

The petitioner's argument as to the application of state antitrust laws deserves a word. Judge Cooper rejected the state law claims because state antitrust regulation would conflict with federal policy and because national "uniformity [is required] in any regulation of baseball and its reserve system." 316 F. Supp., at 280. The Court of Appeals, in affirming, stated, "[A]s the burden on interstate commerce outweighs the states' interests in regulating baseball's reserve system, the Commerce Clause precludes the application here of state antitrust law." 443 F. 2d, at 268. As applied to organized baseball, and in the light of this Court's observations and holdings in *Federal Baseball,* in *Toolson,* in *Shubert,* in *International Boxing,* and in *Radovich,* and despite baseball's allegedly inconsistent position taken in the past with respect to the application of state law,[21]

---

[21] See Brief for Respondent in *Federal Baseball,* No. 204, O. T. 1921, p. 67, and in *Toolson,* No. 18, O. T. 1953, p. 30. See also *State* v. *Milwaukee Braves, Inc.,* 31 Wis. 2d 699, 144 N. W. 2d 1, cert. denied, 385 U. S. 990 (1966).

these statements adequately dispose of the state law claims.

The conclusion we have reached makes it unnecessary for us to consider the respondents' additional argument that the reserve system is a mandatory subject of collective bargaining and that federal labor policy therefore exempts the reserve system from the operation of federal antitrust laws.[22]

We repeat for this case what was said in *Toolson:*

> "Without re-examination of the underlying issues, the [judgment] below [is] affirmed on the authority of *Federal Baseball Club of Baltimore* v. *National League of Professional Baseball Clubs, supra,* so far as that decision determines that Congress had no intention of including the business of baseball within the scope of the federal antitrust laws." 346 U. S., at 357.

And what the Court said in *Federal Baseball* in 1922 and what it said in *Toolson* in 1953, we say again here in 1972: the remedy, if any is indicated, is for congressional, and not judicial, action.

The judgment of the Court of Appeals is

*Affirmed.*

MR. JUSTICE WHITE joins in the judgment of the Court, and in all but Part I of the Court's opinion.

MR. JUSTICE POWELL took no part in the consideration or decision of this case.

MR. CHIEF JUSTICE BURGER, concurring.

I concur in all but Part I of the Court's opinion but, like MR. JUSTICE DOUGLAS, I have grave reservations

---

[22] See Jacobs & Winter, Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage, 81 Yale L. J. 1 (1971), suggesting present-day irrelevancy of the antitrust issue.

as to the correctness of *Toolson* v. *New York Yankees, Inc.,* 346 U. S. 356 (1953); as he notes in his dissent, he joined that holding but has "lived to regret it." The error, if such it be, is one on which the affairs of a great many people have rested for a long time. Courts are not the forum in which this tangled web ought to be unsnarled. I agree with MR. JUSTICE DOUGLAS that congressional inaction is not a solid base, but the least undesirable course now is to let the matter rest with Congress; it is time the Congress acted to solve this problem.

MR. JUSTICE DOUGLAS, with whom MR. JUSTICE BRENNAN concurs, dissenting.

This Court's decision in *Federal Baseball Club* v. *National League,* 259 U. S. 200, made in 1922, is a derelict in the stream of the law that we, its creator, should remove. Only a romantic view [1] of a rather dismal business account over the last 50 years would keep that derelict in midstream.

In 1922 the Court had a narrow, parochial view of commerce. With the demise of the old landmarks of that era, particularly *United States* v. *Knight Co.,* 156 U. S. 1, *Hammer* v. *Dagenhart,* 247 U. S. 251, and *Paul* v. *Virginia,* 8 Wall. 168, the whole concept of commerce has changed.

Under the modern decisions such as *Mandeville Island Farms* v. *American Crystal Sugar Co.,* 334 U. S. 219; *United States* v. *Darby,* 312 U. S. 100; *Wickard* v. *Filburn,* 317 U. S. 111; *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, the power of Congress was recognized as broad enough to reach all phases of the vast operations of our national industrial system.

---

[1] While I joined the Court's opinion in *Toolson* v. *New York Yankees, Inc.,* 346 U. S. 356, I have lived to regret it; and I would now correct what I believe to be its fundamental error.

An industry so dependent on radio and television as is baseball and gleaning vast interstate revenues (see H. R. Rep. No. 2002, 82d Cong., 2d Sess., 4, 5 (1952)) would be hard put today to say with the Court in the *Federal Baseball Club* case that baseball was only a local exhibition, not trade or commerce.

Baseball is today big business that is packaged with beer, with broadcasting, and with other industries. The beneficiaries of the *Federal Baseball Club* decision are not the Babe Ruths, Ty Cobbs, and Lou Gehrigs.

The owners, whose records many say reveal a proclivity for predatory practices, do not come to us with equities. The equities are with the victims of the reserve clause. I use the word "victims" in the Sherman Act sense, since a contract which forbids anyone to practice his calling is commonly called an unreasonable restraint of trade.[2] *Gardella* v. *Chandler*, 172 F. 2d 402 (CA2). And see *Haywood* v. *National Basketball Assn.*, 401 U. S. 1204 (DOUGLAS, J., in chambers).

If congressional inaction is our guide, we should rely upon the fact that Congress has refused to enact bills broadly exempting professional sports from antitrust regulation.[3] H. R. Rep. No. 2002, 82d Cong., 2d Sess.

---

[2] Had this same group boycott occurred in another industry, *Klor's, Inc.* v. *Broadway-Hale Stores, Inc.*, 359 U. S. 207; *United States* v. *Shubert*, 348 U. S. 222; or even in another sport, *Haywood* v. *National Basketball Assn.*, 401 U. S. 1204 (DOUGLAS, J., in chambers); *Radovich* v. *National Football League*, 352 U. S. 445; *United States* v. *International Boxing Club*, 348 U. S. 236; we would have no difficulty in sustaining petitioner's claim.

[3] The Court's reliance upon congressional inaction disregards the wisdom of *Helvering* v. *Hallock*, 309 U. S. 106, 119–121, where we said:

"Nor does want of specific Congressional repudiations . . . serve as an implied instruction by Congress to us not to reconsider, in the light of new experience . . . those decisions . . . . It would require very persuasive circumstances enveloping Congressional silence to

(1952). The only statutory exemption granted by Congress to professional sports concerns broadcasting rights. 15 U. S. C. §§ 1291–1295. I would not ascribe a broader exemption through inaction than Congress has seen fit to grant explicitly.

There can be no doubt "that were we considering the question of baseball for the first time upon a clean slate"[4] we would hold it to be subject to federal antitrust regulation. *Radovich* v. *National Football League,* 352 U. S. 445, 452. The unbroken silence of Congress should not prevent us from correcting our own mistakes.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BRENNAN joins, dissenting

Petitioner was a major league baseball player from 1956, when he signed a contract with the Cincinnati Reds, until 1969, when his 12-year career with the St. Louis Cardinals, which had obtained him from the Reds, ended and he was traded to the Philadelphia Phillies. He had no notice that the Cardinals were contemplating a trade, no opportunity to indicate the teams with which he would prefer playing, and no desire to go to Philadelphia. After receiving formal notification of the trade, petitioner wrote to the Commissioner of Baseball protesting that he was not

---

debar this Court from re-examining its own doctrines. . . . Various considerations of parliamentary tactics and strategy might be suggested as reasons for the inaction of . . . Congress, but they would only be sufficient to indicate that we walk on quicksand when we try to find in the absence of corrective legislation a controlling legal principle."

And see *United States* v. *South-Eastern Underwriters Assn.,* 322 U. S. 533, 556–561.

[4] This case gives us for the first time a full record showing the reserve clause in actual operation.

"a piece of property to be bought and sold irrespective of my wishes,"[1] and urging that he had the right to consider offers from other teams than the Phillies. He requested that the Commissioner inform all of the major league teams that he was available for the 1970 season. His request was denied, and petitioner was informed that he had no choice but to play for Philadelphia or not to play at all.

To non-athletes it might appear that petitioner was virtually enslaved by the owners of major league baseball clubs who bartered among themselves for his services. But, athletes know that it was not servitude that bound petitioner to the club owners; it was the reserve system. The essence of that system is that a player is bound to the club with which he first signs a contract for the rest of his playing days.[2] He cannot escape from the club except by retiring, and he cannot prevent the club from assigning his contract to any other club.

Petitioner brought this action in the United States District Court for the Southern District of New York. He alleged, among other things, that the reserve system was an unreasonable restraint of trade in violation of

---

[1] Letter from Curt Flood to Bowie K. Kuhn, Dec. 24, 1969, App. 37.

[2] As MR. JUSTICE BLACKMUN points out, the reserve system is not novel. It has been employed since 1887. See *Metropolitan Exhibition Co. v. Ewing*, 42 F. 198, 202–204 (CC SDNY 1890). The club owners assert that it is necessary to preserve effective competition and to retain fan interest. The players do not agree and argue that the reserve system is overly restrictive. Before this lawsuit was instituted, the players refused to agree that the reserve system should be a part of the collective-bargaining contract. Instead, the owners and players agreed that the reserve system would temporarily remain in effect while they jointly investigated possible changes. Their activity along these lines has halted pending the outcome of this suit.

federal antitrust laws.[3] The District Court thought itself bound by prior decisions of this Court and found for the respondents after a full trial. 309 F. Supp. 793 (1970). The United States Court of Appeals for the Second Circuit affirmed. 443 F. 2d 264 (1971). We granted certiorari on October 19, 1971, 404 U. S. 880, in order to take a further look at the precedents relied upon by the lower courts.

This is a difficult case because we are torn between the principle of *stare decisis* and the knowledge that the decisions in *Federal Baseball Club* v. *National League,* 259 U. S. 200 (1922), and *Toolson* v. *New York Yankees, Inc.,* 346 U. S. 356 (1953), are totally at odds with more recent and better reasoned cases.

In *Federal Baseball Club,* a team in the Federal League brought an antitrust action against the National and American Leagues and others. In his opinion for a unanimous Court, Mr. Justice Holmes wrote that the business being considered was "giving exhibitions of base ball, which are purely state affairs." 259 U. S., at 208. Hence, the Court held that baseball was not within the purview of the antitrust laws. Thirty-one years later, the Court reaffirmed this decision, without re-examining it, in *Toolson,* a one-paragraph *per curiam* opinion. Like this case, *Toolson* involved an attack on the reserve system. The Court said:

> "The business has . . . been left for thirty years to develop, on the understanding that it was not

---

[3] Petitioner also alleged a violation of state antitrust laws, state civil rights laws, and of the common law, and claimed that he was forced into peonage and involuntary servitude in violation of the Thirteenth Amendment to the United States Constitution. Because I believe that federal antitrust laws govern baseball, I find that state law has been pre-empted in this area. Like the lower courts, I do not believe that there has been a violation of the Thirteenth Amendment.

> subject to existing antitrust legislation. The present cases ask us to overrule the prior decision and, with retrospective effect, hold the legislation applicable. We think that if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation." *Id.*, at 357.

Much more time has passed since *Toolson* and Congress has not acted. We must now decide whether to adhere to the reasoning of *Toolson*—i. e., to refuse to reexamine the underlying basis of *Federal Baseball Club*—or to proceed with a re-examination and let the chips fall where they may.

In his answer to petitioner's complaint, the Commissioner of Baseball "admits that under present concepts of interstate commerce defendants are engaged therein." App. 40. There can be no doubt that the admission is warranted by today's reality. Since baseball is interstate commerce, if we re-examine baseball's antitrust exemption, the Court's decisions in *United States* v. *Shubert,* 348 U. S. 222 (1955), *United States* v. *International Boxing Club,* 348 U. S. 236 (1955), and *Radovich* v. *National Football League,* 352 U. S. 445 (1957), require that we bring baseball within the coverage of the antitrust laws. See also, *Haywood* v. *National Basketball Assn.,* 401 U. S. 1204 (DOUGLAS, J., in chambers).

We have only recently had occasion to comment that:

> "Antitrust laws in general, and the Sherman Act in particular, are the Magna Carta of free enterprise. They are as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms. . . . Implicit in such freedom is the notion that it cannot be foreclosed with respect to one sector of the economy

> because certain private citizens or groups believe
> that such foreclosure might promote greater com-
> petition in a more important sector of the economy."
> United States v. Topco Associates, Inc., 405 U. S.
> 596, 610 (1972).

The importance of the antitrust laws to every citizen
must not be minimized. They are as important to base-
ball players as they are to football players, lawyers,
doctors, or members of any other class of workers. Base-
ball players cannot be denied the benefits of competition
merely because club owners view other economic interests
as being more important, unless Congress says so.

Has Congress acquiesced in our decisions in *Federal
Baseball Club* and *Toolson?* I think not. Had the
Court been consistent and treated all sports in the same
way baseball was treated, Congress might have become
concerned enough to take action. But, the Court was
inconsistent, and baseball was isolated and distinguished
from all other sports. In *Toolson* the Court refused to
act because Congress had been silent. But the Court
may have read too much into this legislative inaction.

Americans love baseball as they love all sports. Per-
haps we become so enamored of athletics that we assume
that they are foremost in the minds of legislators as
well as fans. We must not forget, however, that there
are only some 600 major league baseball players. What-
ever muscle they might have been able to muster by
combining forces with other athletes has been greatly
impaired by the manner in which this Court has iso-
lated them. It is this Court that has made them im-
potent, and this Court should correct its error.

We do not lightly overrule our prior constructions
of federal statutes, but when our errors deny substantial
federal rights, like the right to compete freely and effec-
tively to the best of one's ability as guaranteed by the

antitrust laws, we must admit our error and correct it. We have done so before and we should do so again here. See, e. g., *Blonder-Tongue Laboratories, Inc.* v. *University of Illinois Foundation,* 402 U. S. 313 (1971); *Boys Markets, Inc.* v. *Retail Clerks Union,* 398 U. S. 235, 241 (1970).[4]

To the extent that there is concern over any reliance interests that club owners may assert, they can be satisfied by making our decision prospective only. Baseball should be covered by the antitrust laws beginning with this case and henceforth, unless Congress decides otherwise.[5]

Accordingly, I would overrule *Federal Baseball Club* and *Toolson* and reverse the decision of the Court of Appeals.[6]

This does not mean that petitioner would necessarily prevail, however. Lurking in the background is a hurdle of recent vintage that petitioner still must overcome.

---

[4] In the past this Court has not hesitated to change its view as to what constitutes interstate commerce. Compare *United States* v. *Knight Co.,* 156 U. S. 1 (1895), with *Mandeville Island Farms* v. *American Crystal Sugar Co.,* 334 U. S. 219 (1948), and *United States* v. *Darby,* 312 U. S. 100 (1941).

"The jurist concerned with 'public confidence in, and acceptance of the judicial system' might well consider that, however admirable its resolute adherence to the law as it was, a decision contrary to the public sense of justice as it is, operates, so far as it is known, to diminish respect for the courts and for law itself." Szanton, Stare Decisis; A Dissenting View, 10 Hastings L. J. 394, 397 (1959).

[5] We said recently that "[i]n rare cases, decisions construing federal statutes might be denied full retroactive effect, as for instance where this Court overrules its own construction of a statute . . . ." *United States* v. *Estate of Donnelly,* 397 U. S. 286, 295 (1970). Cf. *Simpson* v. *Union Oil Co. of California,* 377 U. S. 13, 25 (1964).

[6] The lower courts did not reach the question of whether, assuming the antitrust laws apply, they have been violated. This should be considered on remand.

294

In 1966, the Major League Players Association was formed. It is the collective-bargaining representative for all major league baseball players. Respondents argue that the reserve system is now part and parcel of the collective-bargaining agreement and that because it is a mandatory subject of bargaining, the federal labor statutes are applicable, not the federal antitrust laws.[7] The lower courts did not rule on this argument, having decided the case solely on the basis of the antitrust exemption.

This Court has faced the interrelationship between the antitrust laws and the labor laws before. The decisions make several things clear. First, "benefits to organized labor cannot be utilized as a cat's-paw to pull employer's chestnuts out of the antitrust fires." *United States* v. *Women's Sportswear Manufacturers Assn.*, 336 U. S. 460, 464 (1949). See also *Allen Bradley Co.* v. *Local Union No. 3*, 325 U. S. 797 (1945). Second, the very nature of a collective-bargaining agreement mandates that the parties be able to "restrain" trade to a greater degree than management could do unilaterally. *United States* v. *Hutcheson*, 312 U. S. 219 (1941); *United Mine Workers* v. *Pennington*, 381 U. S. 657 (1965); *Amalgamated Meat Cutters* v. *Jewel Tea*, 381 U. S. 676 (1965); cf., *Teamsters Union* v. *Oliver*, 358 U. S. 283 (1959). Finally, it is clear that some cases can be resolved only by examining the purposes and the competing interests of the labor and antitrust statutes and by striking a balance.

It is apparent that none of the prior cases is precisely in point. They involve union-management agreements that work to the detriment of management's competitors. In this case, petitioner urges that the reserve system works to the detriment of labor.

---

[7] Cf. *United States* v. *Hutcheson*, 312 U. S. 219 (1941).

While there was evidence at trial concerning the collective-bargaining relationship of the parties, the issues surrounding that relationship have not been fully explored. As one commentary has suggested, this case "has been litigated with the implications for the institution of collective bargaining only dimly perceived. The labor law issues have been in the corners of the case— the courts below, for example, did not reach them— moving in and out of the shadows like an uninvited guest at a party whom one can't decide either to embrace or expel." [8]

It is true that in *Radovich* v. *National Football League, supra,* the Court rejected a claim that federal labor statutes governed the relationship between a professional athlete and the professional sport. But, an examination of the briefs and record in that case indicates that the issue was not squarely faced. The issue is once again before this Court without being clearly focused. It should, therefore, be the subject of further inquiry in the District Court.

There is a surface appeal to respondents' argument that petitioner's sole remedy lies in filing a claim with the National Labor Relations Board, but this argument is premised on the notion that management and labor have agreed to accept the reserve clause. This notion is contradicted, in part, by the record in this case. Petitioner suggests that the reserve system was thrust upon the players by the owners and that the recently formed players' union has not had time to modify or eradicate it. If this is true, the question arises as to whether there would then be any exemption from the antitrust laws in this case. Petitioner also suggests that there are limits

---

[8] Jacobs. & Winter, Antitrust Principles and Collective Bargaining by Athletes: Of Superstars in Peonage, 81 Yale L. J. 1, 22 (1971).

to the antitrust violations to which labor and management can agree. These limits should also be explored.

In light of these considerations, I would remand this case to the District Court for consideration of whether petitioner can state a claim under the antitrust laws despite the collective-bargaining agreement, and, if so, for a determination of whether there has been an antitrust violation in this case.