**KANSAS CITY ROYALS BASEBALL CORPORATION, Plaintiff-Appellant,**

and

**Golden West Baseball Company, et al. (the other 22 Major League Baseball Clubs), Plaintiffs-Intervenors-Appellants,**

v.

**MAJOR LEAGUE BASEBALL PLAYERS ASSOCIATION, Defendant, Counter-Claim Plaintiff-Respondent.**

No. 76–1115.

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 20, 1976.

Decided March 9, 1976.

616

Harry P. Thomson, Jr., Kansas City, Mo., made argument for appellants. Appendix and appellants' brief were filed by Harry P. Thomson, Jr., Kansas City, Mo., James P. Garner, Cleveland, Ohio, Louis L. Hoynes, Jr., New York City, and Walter J. Kennedy, Kansas City, Mo.

Richard M. Moss, New York City, made argument for defendant. Brief for defendant was filed by Richard M. Moss, New York City, and William A. Jolley and Donald M. Fehr, Gant, Jolley, Moran, Walsh, Hager & Gordon, Kansas City, Mo.

Before GIBSON, Chief Judge, and HEANEY and STEPHENSON, Circuit Judges.

HEANEY, Circuit Judge.

The owners of the twenty-four Major League Baseball Clubs seek reversal of a judgment of the District Court for the Western District of Missouri. The court refused to set aside and ordered enforced an arbitration panel's award rendered in favor of the Major League Baseball Players Association. The arbitration panel was established pursuant to a collective bargaining agreement between the Club Owners and the Players Association. The award relieved pitcher Andy Messersmith of any contractual obligation to the Los Angeles Dodgers, and pitcher Dave McNally of any similar obligation to the Montreal Expos. It directed the Dodgers and Expos to remove Messersmith and McNally, respectively, from their reserve or disqualified lists. It ordered the American and National Leagues to inform and instruct their member clubs that the provisions of Major League Rule 4–A (reserve list rule) and Rule 3(g) (no-tampering rule) do not inhibit, prohibit or prevent such clubs from negotiating or dealing with Messersmith and McNally with respect to employment.

We hold that the arbitration panel had jurisdiction to resolve the dispute, that its award drew its essence from the collective bargaining agreement, and that the relief fashioned by the District Court was appropriate. Accordingly, we affirm the judgment of the District Court.

I

On February 25, 1973, the Club Owners and the Players Association entered into a

collective bargaining agreement to be in effect from January 1, 1973 to December 31, 1975.

Article X of the agreement set forth a comprehensive procedure for the resolution of certain grievances. "Grievance" was defined as "a complaint which involves the interpretation of, or compliance with, the provision of any agreement between the Association and the Clubs or any of them, or any agreement between a Player and a Club * * *." Certain disputes not pertinent here were excepted.[1] A player having a grievance was first required to present the matter to his club. Either the player or Players Association could then appeal the matter to the clubs' Player Relations Committee and to the appropriate League President. Grievances not satisfactorily resolved by these procedures could be submitted to a tripartite panel for binding arbitration. The panel was comprised of one member to be appointed by the Club Owners, one member to be appointed by the Players Association, and an impartial chairman to be chosen jointly by the other two members. The agreement defined the arbitrators' authority as follows:

> With regard to the arbitration of Grievances, the Arbitration Panel shall have jurisdiction and authority only to interpret, apply or determine compliance with the provisions of agreements between the Association and the Clubs or any of them, and agreements between individual Players and Clubs. The Arbitration Panel shall not have jurisdiction or authority to add to, detract from, or alter in any way the provisions of such agreements.

On October 7, 1975, the Players Association filed a grievance on behalf of Andy Messersmith. The grievance alleged that Messersmith played for the Los Angeles Dodgers in 1975 under a renewed 1974 contract, that the renewal year was completed on September 28, 1975, that Messersmith thus became a free agent on that date, and that the Club Owners had denied him his right to deal with other teams for his services in 1976. The Players Association asked that the Club Owners be ordered to treat Messersmith as a free agent and to compensate him for any financial detriment he might incur due to their delay in doing so.

On October 9, 1975, the Players Association filed a companion grievance on behalf of Dave McNally, alleging similar circumstances.[2]

The Club Owners responded to both grievances on October 24, 1975. Their primary contention was that the claims raised fell outside the scope of the agreed upon grievance procedures and were, therefore, not subject to the jurisdiction of the arbitration panel. They argued that Article XV of the 1973 agreement excluded disputes concerning the "core" or "heart" of the reserve system from the grievance procedures set forth in Article X. Article XV provided:

> Except as adjusted or modified hereby, this Agreement does not deal with the reserve system. The Parties have differing views as to the legality and as to the merits of such system as presently consti-

---

1. Article X(A)(1) provided:
   (a) * * * disputes relating to the following agreements between the Association and the Clubs shall not be subject to the Grievance Procedure set forth herein:
   (i) The Major League Baseball Players Benefit Plan.
   (ii) The Agreement Re Major League Baseball Players Benefit Plan.
   (iii) The Agreement regarding dues checkoff.
   
     *   *   *   *   *   *
   
   (b) * * * "Grievance" shall not mean a complaint which involves action taken with respect to a Player or Players by the Com-

missioner involving the preservation of the integrity of, or the maintenance of public confidence in, the game of baseball. * * *

  *   *   *   *   *   *

   (c) * * * "Grievance" shall not mean a complaint or dispute which involves the interpretation or application of, or compliance with the provisions of the first sentence of paragraph 3(c) of the Uniform Player's Contract [Pictures and Public Appearances].

2. The facts with respect to Messersmith and McNally are the same, except that McNally retired during the 1975 season and, therefore, did not play out the entire renewal year.

tuted. This Agreement shall in no way prejudice the position or legal rights of the Parties or of any Player regarding the reserve system.

During the term of this Agreement neither of the Parties will resort to any form of concerted action with respect to the issue of the reserve system, and there shall be no obligation to negotiate with respect to the reserve system.

With respect to the merits of the dispute, the Club Owners argued that under the Uniform Player's Contract, the Dodgers and the Expos had the right to renew Messersmith's and McNally's contracts from year to year for a reasonable number of years. They alternatively argued that under the Major League Rules, the two clubs could obligate the pitchers to play for them and no other Major League Club, simply by placing their names on the clubs' reserve lists.

The arbitration panel set the matter for hearing. Thereafter, on October 28, 1975, the Kansas City Royals Baseball Corporation commenced an action in the United States District Court for the Western District of Missouri seeking a declaratory judgment that the aforesaid grievances were non-arbitrable and an injunction prohibiting the Players Association from proceeding with arbitration. The remaining twenty-three Major League Clubs then joined the action as plaintiffs-intervenors. Subsequently, the Players Association filed a counterclaim, pursuant to § 301 of the Labor-Management Relations Act, 29 U.S.C. § 185, seeking to compel the plaintiffs to arbitrate.

At a pretrial conference on November 6, 1975, the parties agreed to go forward with the scheduled arbitration. It was stipulated that the arbitration panel should initially determine its own jurisdiction, but that the question could later be presented to the District Court on the basis of the record compiled in the arbitration proceeding as well as any other relevant and material

evidence which either side might wish to present.

In accordance with the stipulation, the Messersmith-McNally grievances were submitted to arbitration. Three days of hearings were held, at which voluminous evidence, both testimonial and documentary, was adduced. Four additional days of executive sessions then ensued. On December 23, 1975, the panel[3] rendered its decision, holding that the grievances were within the scope of its jurisdiction and that Messersmith and McNally were free agents. It directed that both parties be removed from the reserve or disqualified lists of their respective clubs, and that the leagues promptly notify their member clubs that they may negotiate with Messersmith and McNally with respect to future employment. The panel denied the Players Association's prayer for damages as premature, but retained jurisdiction as to that and other questions pertaining to the appropriate nature and extent of relief.

Following the issuance of the arbitrators' decree, the dormant District Court action was revived in accordance with the parties' stipulation of November 6, 1975. The Club Owners renewed their efforts to have the dispute declared outside the scope of the arbitration panel's jurisdiction, and the Players Association amended its counterclaim, asking that the Club Owners be directed to comply with the arbitration panel's award.

The court admitted into evidence the record compiled in the arbitration proceeding. It also conducted three days of evidentiary hearings at which it received in evidence a wealth of exhibits, including various portions of the record compiled in *Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972); a copy of the "Celler Report," a House Report of the Subcommittee on Monopoly Power, 82nd Cong. 1952; records reflecting other arbitration proceedings had under baseball's grievance procedures; and copies of contemporaneous notes

---

**3.** The arbitration panel's decision was written by Peter Seitz, the impartial chairman. Marvin Miller, the Players Association's representative,

concurred. John Gaherin, the Club Owners' representative, dissented.

taken by several participants in meetings held pursuant to or in the course of negotiating baseball's various collective bargaining agreements.

The District Court held that the Messersmith-McNally grievances were within the scope of the arbitration panel's jurisdiction, and that neither the arbitrators' resolution of the merits nor the relief awarded exceeded the bounds of the panel's authority. It ordered enforcement of the arbitration panel's award.[4]

The Club Owners perfected a timely appeal.[5] On appeal, they renew their contention that the Messersmith-McNally grievances are not within the purview of the arbitration panel's jurisdiction. They additionally argue that the arbitration panel's award exceeded the scope of its authority. They further maintain that the District Court's decree is fatally defective in that it operates against persons who were not parties to the proceedings before the arbitration panel or the court, and that it is ambiguous and indefinite.

## II

The Supreme court articulated the legal principles applicable to the arbitration of labor disputes in the *Steelworkers* trilogy,[6] and recently reaffirmed them in *Gateway Coal Co. v. United Mine Workers of America,* 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974).

A party may be compelled to arbitrate a grievance only if it has agreed to do so. *Gateway Coal Co. v. United Mine Workers of America, supra; United Steelworkers of America v. Warrior & Gulf Nav-*

igation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *International Union, Etc. v. I.T. & T.,* 508 F.2d 1309 (8th Cir. 1975); *Laundry, Dry Cleaning & Dye House Workers International Union, Local 93 v. Mahoney,* 491 F.2d 1029 (8th Cir.), *cert. denied,* 419 U.S. 825, 95 S.Ct. 42, 42 L.Ed.2d 49 (1974). The question of arbitrability is thus one of contract construction and is for the courts to decide. *See, e. g., Wiley & Sons v. Livingston,* 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964); *General Drivers & Helpers Union, Local No. 554 v. Young & Hay Transportation Co.,* 522 F.2d 562 (8th Cir. 1975).

In resolving questions of arbitrability, the courts are guided by Congress's declaration of policy that arbitration is the desirable method for settling labor disputes. *See* § 203 of the Labor-Management Relations Act, 29 U.S.C. § 173(d). Accordingly, a grievance arising under a collective bargaining agreement providing for arbitration must be deemed arbitrable "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *United Steelworkers of America v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 582–583, 80 S.Ct. at 1353, 4 L.Ed.2d at 1417, *cited with approval in Gateway Coal Co. v. United Mine Workers of America, supra,* 414 U.S. at 377–388, 94 S.Ct. at 636–637, 38 L.Ed.2d at 592 and *Laundry, Dry Cleaning & Dye House Workers International Union, Local 93 v. Mahoney, supra,* 491 F.2d at 1032. Consistent with these principles, a broad arbitration

---

**4.** The District Court's opinion is published at 409 F.Supp. 233 (W.D.Mo.1976).

**5.** Immediately after entry of the District Court's order, the Club Owners moved to stay execution of the mandate pending disposition of an appeal. The court denied the motion, but, *sua sponte,* stayed enforcement of its order for ten days. After filing their notice of appeal, the Club Owners applied to this Court for a stay pending determination of the appeal. We reserved ruling on the application and scheduled an expedited hearing on the merits of the appeal to be held prior to the expiration of the

District Court's stay order. Following the hearing, which was held on February 20, 1976, we stayed execution of the District Court's mandate until further notice.

**6.** *United Steelworkers of America v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

provision may be deemed to exclude a particular grievance in only two instances: (1) where the collective bargaining agreement contains an express provision clearly excluding the grievance involved from arbitration; or (2) where the agreement contains an ambiguous exclusionary provision and the record evinces the most forceful evidence of a purpose to exclude the grievance from arbitration. *See United Steelworkers of America v. Warrior & Gulf Navigation Co., supra; Gateway Coal Co. v. United Mine Workers of America, supra; Laundry, Dry Cleaning & Dye House Workers International Union, Local 93 v. Mahoney, supra.*

■ If it is determined that the arbitrator had jurisdiction, judicial review of his award is limited to the question of whether it "draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597, 80 S.Ct. 1358, 1361, 4 L.Ed.2d 1424, 1428 (1960), *cited with approval in General Drivers & Helpers Union, Local No. 554 v. Young & Hay Transportation Co., supra,* 522 F.2d 567–568 *and International Union, Etc. v. White Motor Corp.,* 505 F.2d 1193, 1197 (8th Cir. 1974), *cert. denied,* 421 U.S. 921, 95 S.Ct. 1588, 43 L.Ed.2d 789 (1975). We do not sit as an appellate tribunal to review the merits of the arbitrator's decision.

We turn first to the question of the jurisdiction of the panel to arbitrate the Messersmith-McNally grievances.

### III

■ We begin with the proposition that the language of Article X of the 1973 agreement is sufficiently broad to require arbitration of the Messersmith-McNally grievances. We think this clear because the disputes involve the interpretation of the provisions of agreements between a player or the Players Association and a club or the Club Owners. The grievances require the construction of agreements manifested in paragraphs 9(a) and 10(a) of the Uniform Player's Contract.

9.(a) The Club and the Player agree to accept, abide by and comply with all provisions of the Major League Agreement, the Major League Rules, the Rules or Regulations of the League of which the Club is a member, and the Professional Baseball Rules, in effect on the date of this Uniform Player's Contract, which are not inconsistent with the provisions of this contract or the provisions of any agreement between the Major League Clubs and the Major League Baseball Players Association, provided that the Club, together with the other Clubs of the American and National Leagues and the National Association, reserves the right to modify, supplement or repeal any provision of said Agreement, Rules and/or Regulations in a manner not inconsistent with this contract or the provisions of any then existing agreement between the Major League Clubs and the Major League Baseball Players Asociation [sic].

10.(a) On or before December 20 (or if a Sunday, then the next preceding business day) in the year of the last playing season covered by this contract, the Club may tender to the Player a contract for the term of that year by mailing the same to the Player at his address following his signature hereto, or if none be given, then at his last address of record with the Club. If prior to the March 1 next succeeding said December 20, the Player and the Club have not agreed upon the terms of such contract, then on or before 10 days after said March 1, the Club shall have the right by written notice to the Player at said address to renew this contract for the period of one year on the same terms, except that the amount payable to the Player shall be such as the Club shall fix in said notice; provided, however, that said amount, if fixed by a Major League Club, shall be an amount payable at a rate not less than 80% of the rate stipulated for the next preceding year and at a rate not less than 70% of the rate stipulated for the year immediately prior to the next preceding year.

The interpretation of paragraph 9(a), in turn, requires the construction of Major League Rules 3(g) and 4–A(a).

3(g) TAMPERING. To preserve discipline and competition, and to prevent the enticement of players, coaches, managers and umpires, there shall be no negotiations or dealings respecting employment, either present or prospective, between any player, coach or manager and any club other than the club with which he is under contract or acceptance of terms, or by which he is reserved, or which has the player on its Negotiation List, or between any umpire and any league other than the league with which he is under contract or acceptance of terms, unless the club or league with which he is connected shall have, in writing, expressly authorized such negotiations or dealings prior to their commencement.

4–A(a) FILING. On or before November 20 in each year, each Major League Club shall transmit to the Commissioner and to its League President a list of not exceeding forty (40) active and eligible players, whom the club desires to reserve for the ensuing season; and also a list of all its players who have been promulgated as placed on the Military, Voluntarily Retired, Restricted, Disqualified, Suspended or Ineligible Lists; and players signed under Rule 4 who do not count in the club's under control limit. On or before November 30 the League President shall transmit all of said lists to the Secretary-Treasurer of the Executive Council, who shall thereupon promulgate same, and thereafter no player on any list shall be eligible to play for or negotiate with any other club until his contract has been assigned or he has been released.

The Messersmith-McNally grievances might also be viewed as involving construction of the 1973 collective bargaining agreement

itself. The provisions set forth above were made a part of that agreement under Article III, which incorporated by reference the terms of the Uniform Player's Contract.

Although we find that the grievances are arbitrable under Article X standing alone,[7] we cannot ignore the existence of Article XV, which provides, *inter alia*, that the agreement "does not deal with the reserve system."

The provisions of the Uniform Player's Contract and the Major League Rules cited above are among the many contract provisions and rules which together constitute the reserve system.[8] In fact, the Club Owners maintain that they are the very "core" or "heart" of the reserve system. The Club Owners argue that Article XV removed grievances arising out of the cited clauses from the coverage of Article X, and that when the agreement is read as a whole, as it must be, the Messersmith-McNally grievances are not arbitrable.

The District Court rejected this argument. It recognized that the agreement must be construed as a whole, but concluded that Article XV could not be interpreted to exclude any grievances from the procedures set forth in Article X.

■■ We find the question more difficult than did the District Court. We cannot say that Article XV, on its face, constitutes a clear exclusionary provision. First, the precise thrust of the phrase "this Agreement does not deal with the reserve system" is unclear. The agreement incorporates the provisions which comprise the reserve system. Also, the phrase is qualified by the words "except as adjusted or modified hereby." Second, the impact of the language "This Agreement shall in no way prejudice the position * * * of the Parties" is uncertain. Third, the "concerted action" which the parties agree to forego

---

**7.** The Club Owners concede this point, although they argue that Article X would not have remained constant had Article XV not been included.

**8.** The reserve system is a group of contract provisions and rules designed to bind a player to a particular team. One or the other of the

parties contends that the following provisions are part of the reserve system: Uniform Player's Contract—Paragraphs 2, 5(a), 6(a–c), 7(b)(1–3), 7(c–e), 7(f)(1–5), 9(a), 10(a–b); Regulations 5 and 7. Major League Rules 3(a), 3(g), 4–A(a) and 9.

does not clearly include bringing grievances. Fourth, Article XV affords no basis for the Club Owners' distinction between the "core" and the periphery of the reserve system. Finally, Article X(A)(1), which declares certain disputes non-grievable, is silent as to the reserve system. We find, however, that Article XV creates an ambiguity as to whether the grievances here involved are arbitrable. Accordingly, we must look beyond the face of the agreement and determine whether the record as a whole evinces the most forceful evidence of a purpose to exclude these grievances from arbitration. *See United Steelworkers of America v. Warrior & Gulf Navigation Co., supra.*[9]

We proceed to an examination of the evidence presented to the District Court pertaining to the parties' intent. Of particular relevance is the history of collective bargaining between the parties.

### A. 1968 Basic Agreement.

The Players Association and Club Owners entered into their first collective bargaining agreement on February 19, 1968.[10] The agreement was retroactive to January 1, 1968, and expired on December 31, 1969.

The 1968 agreement established the grievance procedures which continued in effect through the 1973 agreement. The agreement excluded disputes relating to benefit plans and the dues check-off agreement from the grievance and arbitration procedures.[11] The Commissioner of Baseball was designated as the impartial arbitrator.

During the period that the 1968 agreement was in force, the provisions of the Uniform Player's Contract and the Major League Rules set forth above were in effect in substantially similar form. The 1968 agreement incorporated by reference those

provisions in the same manner as the later agreements.

The 1968 agreement contained no provision analogous to Article XV of the 1973 agreement. With respect to the reserve system, Article VIII provided:

> The parties shall review jointly the matters of (a) the length of the championship season and (b) possible alternatives to the reserve clause as now constituted.
>
> The joint review of the matter of the length of the championship season shall commence as early as practicable and shall be completed prior to the drawing up of the preliminary schedules for 1969.
>
> The joint review of the reserve clause shall be completed prior to the termination date of this Agreement.
>
> Subject to Article III, Section B, it is mutually agreed that the Clubs shall not be obligated to bargain or seek agreement with the Players Association on either of the above matters during the term of this Agreement.

Pursuant to Article VIII, the parties held three meetings to discuss possible modification of the reserve system. No agreement was reached. At trial, Marvin Miller, Executive Director of the Players Association and a participant in those meetings, testified that no further discussions were held because the Club Owners refused to consider significant changes in the reserve system.

### B. 1970 Basic Agreement.

The Club Owners and Players Association entered into their second collective bargaining agreement on May 12, 1970. This agreement was in force from January 1, 1970 to December 31, 1972.

The 1970 agreement provided for grievance procedures similar to those established

---

9. We emphasize that our task is not to resolve the ambiguity by the preponderance of evidence. Where a collective bargaining agreement contains a broad arbitration provision and a vague exclusionary clause, only the most forceful evidence of an intent to exclude a category of grievances from arbitration will overcome the presumption of arbitrability.

10. The Major League Baseball Players Association was formed in 1966.

11. These exceptions were the same as those embodied in Article X(A)(1)(a) of the 1973 agreement. *See* n.1, *supra.*

in 1968. Two significant changes were made which were carried over into the 1973 agreement. First, the tripartite panel replaced the Commissioner of Baseball as the impartial arbitrator. Second, the agreement excepted two additional categories of disputes from the grievance procedures, namely complaints involving actions against players taken by the Commissioner involving the integrity of the game, and complaints involving pictures and public appearances.[12]

The 1970 agreement incorporated the Uniform Player's Contract and the Major League Rules in the same manner as the 1968 and 1973 agreements.

During the negotiations leading up to the 1970 agreement, the Players Association submitted a number of proposed modifications of the reserve system, including a provision which would give each player the option of becoming a free agent once every three years. The Club Owners rejected these proposals as unacceptable, stating that they went to the heart of the game and the reserve system. In February, 1970, it became apparent that the parties had reached an impasse on the reserve system. Richard Moss, General Counsel to the Players Association, recollected that Marvin Miller then suggested:

> We are not making any progress on modifications in the Reserve System. We are running out of time, in terms of the date of the negotiations, the approach of the season, and if it is mutually desirable to make an agreement we have got to do something about this issue that we are not making any progress on, and therefore we ought to set it aside.

At approximately the same time that the 1970 negotiations were reaching an impasse

on the reserve system, Curt Flood, an outfielder traded by the St. Louis Cardinals to the Philadelphia Phillies, filed suit in federal court challenging the validity of the reserve system.[13] Flood's complaint defined the reserve system as a number of provisions designed to bind a player to a particular club for the duration of his career. He claimed that the reserve system violated federal antitrust laws.[14]

The Club Owners asserted, as a defense to the Flood action, that the parties had agreed to the reserve system through collective bargaining, and that the system was, therefore, exempt from federal antitrust laws. *See Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965).[15] As a result of the assertion of that defense, Arthur Goldberg, Chief Counsel for Flood, suggested to the Players Association's negotiators that a provision be included in the 1970 agreement which would obviate the *Jewel Tea* defense.

In accordance with Goldberg's suggestion, and their desire to enter into a collective bargaining agreement despite the parties' differences on the reserve system, the Players Association proposed that the following provision be included in the 1970 agreement:

> *Regardless of any provision herein to the contrary, the Basic Agreement does not deal with the reserve system.* The parties have differing views as to the merits of such system as presently constituted. This Agreement shall in no way prejudice the parties or any player's position or legal rights related thereto.

During the pendency of any present litigation relating to the reserve system, it is agreed that *the parties will not during the term of this Agreement resort to*

---

**12.** These exceptions were the same as those embodied in Article X(A)(1)(b) and (c) of the 1973 agreement.

**13.** The Players Association provided financial support for Flood's lawsuit and assisted him in obtaining counsel.

**14.** Flood's lawsuit was unsuccessful. By a five-three margin, the Supreme Court held, on the basis of *stare decisis*, that baseball's re-

serve system was exempt from federal antitrust laws. *Flood v. Kuhn*, 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972).

**15.** In *Amalgamated Meat Cutters v. Jewel Tea Co.*, 381 U.S. 676, 85 S.Ct. 1596, 14 L.Ed.2d 640 (1965), a majority of the Supreme Court held that agreements reached through mandatory collective bargaining may be exempt from federal antitrust laws.

*strike or lockout on that issue.* However, upon the rendering of a final court decision in such litigation, either party may upon the giving of 30 day's written notice to the other party, reopen this Agreement and thereafter the parties may resort to any legal and appropriate action in support of their respective positions on this issue. [Emphasis added.]

Richard Moss testified that the proposal was designed to insure that the agreement would not prejudice the Flood litigation; to provide for reopening the agreement on the subject of the reserve system upon the termination of the lawsuit; and to immunize the Players Association from any potential liability as a co-conspirator in an agreement claimed to be in violation of federal antitrust laws.

Louis Hoynes, Counsel to the National League, testified that he was aware of the Players Association's desire to neutralize the *Jewel Tea* defense, but was unsure as to what other motivations the Association had in making the proposal set forth above. He stated:

[T]here was a lot of discussion among ourselves that evening as to exactly what the Association had in mind, what its purposes, its motives were. We were well satisfied then as we have continued to be satisfied throughout the rest of our relationship with the Association that the reasons that they gave as their motive for certain proposals need not bear any relationship to the real motive that they have and that is true of people generally.

He later testified that both parties were often less than candid in disclosing the purposes behind bargaining proposals.

According to Hoynes, the Club Owners' objections to the Players Association's proposal centered primarily around the language "the Basic Agreement does not deal with the reserve system." They were concerned that the reserve system would be unenforceable if totally excluded from the agreement. They also wanted to retain the *Jewel Tea* defense in the Flood case. They were further apprehensive that the language would remove the reserve system

from the coverage of the "zipper clause," which provided that there was no obligation to negotiate on bargainable subjects during the term of the collective bargaining agreement.

The Club Owners were also dissatisfied with the Players Association's proposal regarding the means by which the parties could seek to further their respective positions on the reserve system. Although the proposal proscribed strikes and lockouts, the Club Owners felt that it permitted other types of actions which could be equally disruptive to their operations.

In an effort to obviate these objections, the Club Owners submitted the following counterproposal:

*Regardless of any provision herein to the contrary, this Basic Agreement does not constitute an agreement between the parties as to the merits or legality of the reserve system.* This Agreement shall in no way prejudice the position or legal rights of the parties or of any player regarding the reserve system.

It is agreed that during the term of this Agreement neither of the parties will resort to any form of concerted action, or encourage or support, directly or indirectly, any claim or litigation (other than *Flood v. Kuhn, et al.*, pending in the U. S. District Court for the Southern District of N. Y.) on the issue of the reserve system, or any part thereof, and neither of the parties shall be obligated to negotiate regarding the reserve system. [Emphasis added.]

The parties finally agreed upon the following language, which became Article XIV of the 1970 agreement:

*Reserve System*

Regardless of any provision herein to the contrary, this Agreement does not deal with the reserve system. The parties have differing views as to the legality and as to the merits of such system as presently constituted. This Agreement shall in no way prejudice the position or legal rights of the Parties or of any Player regarding the reserve system.

It is agreed that until the final and unappealable adjudication (or voluntary discontinuance) of *Flood v. Kuhn et al.,* now pending in the federal district court of the Southern District of New York, neither of the Parties will resort to any form of concerted action with respect to the issue of the reserve system, and there shall be no obligation to negotiate with respect to the reserve system. Upon the final and unappealable adjudication (or voluntary discontinuance) of *Flood v. Kuhn et al.,* either Party shall have the right to reopen negotiations on the issue of the reserve system as follows:

a. in the event such adjudication (or discontinuance) occurs between October 15 in any year and January 15 in the following year, inclusive, either Party may thereafter reopen such negotiation, upon 10 days' prior written notice, provided that such notice is given on or before January 15;

b. in the event such adjudication (or discontinuance) occurs between January 16 and October 14, inclusive, in any year, either Party may thereafter reopen such negotiation on or after November 1, upon 10 days' prior written notice, provided that such notice is given on or before January 15 in any following year.

Hoynes testified that the Club Owners agreed to accept the language "this Agreement does not deal with the reserve system" on the basis of assurances given by Miller. Hoynes stated that during negotiations, he questioned the enforceability of the reserve system. He quoted Miller as responding: "It is going to be outside the Agreement. It will not be subject to the Agreement, but we will acquiesce in the continuance of the enforcement of the rules as house rules and we will not grieve over those house rules." Evidence that Miller made a statement that the Players Association would not grieve over house rules appears in contemporaneous notes of attorneys representing the Club Owners. Miller denies that he made the statement attributed to him.[16]

The Club Owners also compromised on their desire to retain the *Jewel Tea* defense. They felt that the language finally agreed upon weakened but did not necessarily destroy the defense.

Both parties compromised on the question of reserve system negotiations, addressing that issue expressly in the second paragraph of Article XIV. Both parties also compromised on the actions they could take in furtherance of their positions on the reserve system. They agreed that "neither of the parties will resort to any form of concerted action with respect to the reserve system."

Richard Moss testified that Article XIV, as finally agreed upon, excluded the reserve system from the 1970 agreement for purposes of litigation only. It did not preclude arbitration of any grievances otherwise arbitrable.

Prior to the start of the 1971 season, Marvin Miller informed the players that, in his view, a player could become a free agent by playing for one year under a renewed contract. It does not appear, however, that any player played for a full year under a renewed contract while the 1970 agreement was in effect.[17] In 1972, the St. Louis Cardinals renewed the contracts of Jerry Reuss and Ted Simmons. Reuss was thereafter traded to the Houston Astros and signed a new contract. Simmons agreed to terms with the Cardinals in mid-season.

---

**16.** The District Court found that the Players Association did not forego their right to grieve over the reserve system. It is not clear whether this finding rested on the court's view of the credibility of the witnesses, or on the ambiguity in the term "house rules." In either event, the finding supports the District Court's conclusion.

**17.** Players are discouraged from playing under a renewed contract in two ways: first, by doing so, a player may incur a substantial pay reduction; and, second, despite the renewal clause, Major League Rule 3(c)(1) allows a club to prohibit a player from playing unless he signs a new contract. This rule has not always been enforced; however, it has been invoked on occasion.

During the term of the 1970 agreement, a few grievances which involved one or more of the provisions that comprise the reserve system were submitted to arbitration. The Club Owners raised no jurisdictional objections. They felt that the grievances did not concern the "core" or "heart" of the reserve system, and that they were, therefore, arbitrable.

## C. 1973 Basic Agreement.

The relevant portions of the 1973–1975 collective bargaining agreement have been set forth above. Our focus here is on the negotiations preceding the execution of that agreement.

During the negotiations, the Players Association proposed a number of changes in the reserve system, all but two of which were rejected by the Club Owners. The parties did agree upon a provision allowing a player who had been in the Major Leagues at least ten years and had played for his present club at least the past five years to veto a trade. The parties also agreed to arbitrate salary disputes.

In the course of negotiating salary arbitration procedures, the Club Owners proposed that both the player and his club be required to execute a new contract before either would be permitted to initiate salary arbitration. The contract would leave the amount of salary undetermined, to be filled in by the arbitration panel. The Players Association agreed to such a procedure where the player initiated arbitration, but objected to the imposition of that requirement where the salary grievance was filed by the club. Marvin Miller recalled that he stated his objection as follows:

> I said to the owners' representatives, "It is clear to us what you are trying to do and it ought to be equally clear why it is not acceptable. Under the present set of restrictive rules, there is one procedure left to the player; that is, he can refuse to sign and can play under the owner's option for one year." I continued by saying, "What you have proposed is not only to not modify the reserve system, as we have proposed, but also to close the

last vestige of rights, the right of the player to become a free agent after a one-year renewal."

Contemporaneous notes taken by Richard Moss largely corroborate Miller's account of his statement. According to those notes, Miller stated: "What you propose is not only to not modify Reserve System but also to close last tiny loophole." Written across the phrase "last tiny loophole" in Moss's notes are the words "Right of Player to become a free agent."

Hoynes, who also participated in the salary arbitration discussions, testified to a different recollection of Marvin Miller's statement. He did not view the statement as relating to free agency. Rather, he thought Miller was referring to a player's right to do what Ted Simmons had done: begin the season under a renewed contract, perform well, and obtain a higher salary on the basis of that performance than was originally offered.

In any event, the parties finally agreed to a provision under which a player could withdraw from club-initiated salary arbitration and thus avoid being compelled to sign a new contract. If the player initiated arbitration, however, he was required to sign a contract.

Aside from the provisions discussed above, the parties were deadlocked on the issue of further reserve system modifications. That impasse, which was delaying execution of the 1973 agreement, continued into early February, 1973. With the status of the collective bargaining agreement in doubt, the Club Owners withdrew previously-issued invitations to players to attend pre-spring training conditioning, which was scheduled to begin shortly. Marvin Miller then proposed that the parties set aside the reserve system as they had in 1970. He suggested that language similar to Article XIV of the 1970 agreement be adopted for that purpose.

Hoynes testified that the Club Owners were amenable to setting aside the reserve system from the agreement, but that they opposed adopting the language "this Agree-

ment does not deal with the reserve system." He stated:

> We felt that we were in the process of making some rather substantial changes in the wide area of the Reserve System and we wanted some appropriate recognition of that because we knew that Mr. Miller would be going to Congress as he already had and was clearly planning to again seek some sort of relief following the invitation of the Supreme Court in the Flood case, and we did not want Mr. Miller to be armed with a banner in the form of a new article in this Agreement that said that the Agreement did not deal with the Reserve System and which would permit Mr. Miller to say here again that management has insisted on retaining its historic rights outside of the Agreement without our agreement and would not, with that, mention to the people that he was addressing the various changes, important changes in Players' rights that we thought we had made in the broad area of the Reserve System, so we wanted some language in this very article that would suggest that something had been done—

Hoynes then proposed that the agreement provide that it doesn't deal with "free agency." The Players Association rejected that proposal, stating that it did not want to adopt new language. The Club Owners continued to press for recognition, however, that changes had been made in the reserve system. Hoynes stated:

> We discussed the possibility of listing the things we had changed, and then we got into an argument about whether the things we had changed really affected what we were talking about whether they really affected the Reserve System or not. It became obvious that we were never going to resolve that in a short matter of time, so I suggested some language that I hoped was sufficiently ambiguous that we would be able to use it to make our point later and the Association would be entitled to make their points later and that language was the preamble that you now have as to the first sen-

tence of Article XV, except as adjusted or modified hereby.

> Now, the Association, so it seemed to me, and we discussed this, said, well, there really weren't adjustments or modifications and we don't know what they meant when they put that language in and we can say well, we think they were things that were important here, and we would want to point out, this language simply was an ambiguous, intentionally ambiguous, compromise of a point that would give both parties an opportunity to get up before a Congressional Committee and argue whether or not something had been done in the area of the Reserve System, and Mr. Miller indicated that he had a favorable reaction to that language, that he would review it and then we proceeded to other matters.

The parties finally agreed to carry over the language of Article XIV of the 1970 agreement into the 1973 agreement with two exceptions. First, the clause "except as adjusted or modified hereby" was substituted as the prefatory language to "this Agreement does not deal with the reserve system". Second, reference to the Flood litigation was deleted. Article XIV of the 1970 agreement, as modified, was incorporated into the 1973 agreement as Article XV. Hoynes stressed that both parties recognized that the clause "except as adjusted or modified hereby" was ambiguous.

Marvin Miller testified that while Article XV was being discussed, it occurred to him that deleting reference to the Flood litigation might allow the Club Owners to assert that they could now make unilateral changes in the reserve system. The Players Association was also anxious to continue to protect itself from potential liability as a co-conspirator in the reserve system. Accordingly, the Players Association requested and obtained the following side letter from the Club Owners:

> The following will confirm our understandings with regard to Article XV of the Basic Agreement effective January 1, 1973:

1. Notwithstanding the above provision, it is hereby understood and agreed that the Clubs will not during the term of the Agreement, make any unilateral changes in the Reserve System which would affect player obligations or benefits.

2. It is hereby understood and agreed that during the term of the Agreement the Clubs will indemnify and save harmless the Players Association in any action based on the Reserve System brought against the Association as a party defendant.

Richard Moss testified that the purpose and effect of Article XV, as finally agreed upon, was to treat the reserve system in the same manner as the parties had in 1970.

Other than the Messersmith-McNally grievances, only one grievance was filed during the term of the 1973 agreement which the Club Owners felt concerned the "core" or "heart" of the reserve system.[18] That grievance was filed by Bobby Tolan, an outfielder who played in 1974 under a renewed contract. Tolan's grievance was similar to those involved in this case. The Club Owners responded that the grievance was not within the scope of the grievance procedures provided for in the 1973 agreement; however, that issue was never resolved. Tolan signed a retroactive contract at the end of the season and withdrew his grievance before it was submitted to arbitration.

### IV

■ We cannot say, on the basis of the evidence discussed above, that the record evinces the most forceful evidence of a purpose to exclude the grievances here involved from arbitration.

(a) The 1968 agreement clearly permitted the arbitration of grievances relating to the reserve system. It, therefore, cannot be said that the Club Owners never consented to the arbitration of such grievances. The Club Owners might have argued that they agreed to arbitrate such grievances because the Commissioner of Baseball was designated as the arbitrator, and that he, recognizing the importance of the reserve system to baseball, would interpret the disputed provisions to allow perpetual control by a Club Owner over its players. That argument, however, was not advanced before either the arbitration panel, the District Court or this Court. Moreover, the argument would not be particularly flattering to any Commissioner of Baseball.[19]

(b) Article XIV, the predecessor to Article XV, was suggested by the Players Association for rather specific purposes and the Club Owners clearly did what they could to preserve their right to argue that the reserve system remained a part of the collective bargaining agreement. Indeed, if the Club Owners' counterproposals with respect to Article XIV had been accepted, the reserve system would clearly have remained subject to arbitration.

Article XV was clearly designed to accomplish the same purposes as Article XIV. If in accomplishing these purposes the players had clearly agreed to exclude disputes arising out of the operation of the reserve system from arbitration, the Messersmith-McNally grievances would not be arbitra-

---

18. Perhaps the most famous grievance of this period was that filed by James "Catfish" Hunter. Hunter claimed that the Oakland Athletics had defaulted on his salary, and that he, therefore, had the right to terminate his contract and become a free agent under Paragraph 7(a) of the Uniform Player's Contract. No jurisdictional objection was asserted, and the arbitration panel sustained Hunter's grievance. The Oakland Athletics thereafter filed suit challenging the panel's award in the California state court. An attack on the panel's jurisdiction similar to that raised here has been asserted in those proceedings.

19. Mr. Bowie Kuhn, the present Commissioner of Baseball, testified, in substance, that he felt that Article X of the 1973 agreement gave him the power to withdraw a grievance from arbitration if he felt that the grievance involved the "preservation of the integrity of, or the maintenance of public confidence in, the game of baseball." He testified further that he did not withdraw these grievances from arbitration because he didn't want to do anything to adversely affect the collective bargaining process: he respected the reputation of Mr. Seitz, the impartial arbitrator, and he respected the arbitration process.

ble. For the reasons discussed in this opinion, however, no such agreement can be found.

(c) From 1970 to 1973, a number of grievances concerning the reserve system were submitted to arbitration. The Club Owners raised no jurisdictional objections. While this fact alone is not of controlling significance, because the grievances submitted did not go to what the Club Owners regard as the "core" or "heart" of the reserve system, the submission of grievances relating to the reserve system is certainly a fact that detracts from the Club Owners' contention that the parties clearly understood Article XIV to mean that grievances relating to the reserve system would not be subject to arbitration.

(d) The fact that Marvin Miller may have given assurances, during the 1970 negotiations, that the players would not grieve over house rules cannot be viewed as the most forceful evidence of a purpose to exclude the Messersmith-McNally grievances from arbitration. First, there is some dispute in the record as to whether Miller made such a statement. Second, assuming he did, the term "house rules" is ambiguous. Third, and we think most important, the weight of the evidence, when viewed as a whole, does not support the conclusion that Article XV was intended to preclude arbi-

tration of any grievances otherwise arbitrable.

(e) The essence of the Club Owners' arguments on the question of arbitrability was perhaps best articulated in the testimony of Larry McPhail, President of the American League, in which he stated: "Isn't it fair to say that our strong feelings on the importance of the core of the reserve system would indicate that we wouldn't permit the reserve system to be within the jurisdiction of the arbitration procedure?" The weaknesses in this argument have been previously discussed in paragraphs (a), (b) and (c) above. We add only that what a reasonable party might be expected to do cannot take precedence over what the parties actually provided for in their collective bargaining agreement.[20]

V

The Club Owners contend that even if the arbitration panel had jurisdiction, the award must be vacated. They argue that the award exceeded the scope of the panel's authority by "fundamentally altering and destroying the Reserve System as it historically existed and had been acquiesced in by the Association."

As we have previously noted, our review of the merits of an arbitration panel's award is limited. The award must be sus-

20. As an alternative to reversal, the Club Owners ask that we remand this case to the District Court. They contend, first, that the court failed to consider the evidence extrinsic to the face of the agreement. It is clear to us that although the court reached its decision primarily on the basis of the language of the agreement, it also considered the other evidence presented to it and concluded that it did not evince a clear intent to exclude the grievances here involved from arbitration. Accordingly, no remand is warranted on that basis. The Club Owners further contend that the District Court erroneously excluded evidence pertaining to the historical operation of the reserve system and certain statements made by Marvin Miller before various forums. Miller was said to have characterized the reserve system as enabling a club to perpetually control a player. The evidence with respect to the historical operation of the reserve system tended to show that over the past century, the Club Owners have consistently strived to control a player for

the duration of his career, that various means were employed to that end, and that those efforts met with varying degrees of success. Evidence as to both Miller's statements and the historical operation of the reserve system was presented to the District Court; however, the court declined to adopt proposed findings of fact predicated thereon, finding that they were irrelevant and immaterial. We have considered the evidence set forth above in the course of our examination of the entire record, and find that it does not show that the parties clearly intended to exclude reserve system disputes from arbitration. Accordingly, no remand is warranted. The Club Owners finally contend that the Players Association should be estopped from asserting that the reserve system is anything different from what Curt Flood claimed it to be or the Supreme Court found it to be in *Flood v. Kuhn, supra* note 14. We find no merit in this contention. There is no identity of issues in the two proceedings.

tained so long as it "draws its essence from the collective bargaining agreement." *United Steelworkers of America v. Enterprise Wheel & Car Corp., supra,* 363 U.S. at 597, 80 S.Ct. at 1361, 4 L.Ed.2d at 1428; *cited with approval in General Drivers & Helpers Union, Local No. 554 v. Young & Hay Transportation Co., supra,* 522 F.2d at 567–568 *and International Union, Etc. v. White Motor Corp., supra,* 505 F.2d at 1197.

The nub of the Club Owners' argument is that both they and the Players Association understood the reserve system to enable a club to perpetually control a player, that this understanding was reflected in the 1973 agreement, and that the arbitration panel was without authority to alter the agreed upon operation of the reserve system.

We cannot agree that the 1973 collective bargaining agreement embodied an understanding by the parties that the reserve system enabled a club to perpetually control a player. First, the agreement contained no express provision to that effect. Second, while there is evidence that the reserve system operated in such a manner in recent years,[21] the record discloses that various Players Association representatives viewed the system as allowing a player to become a free agent by playing under a renewed contract for one year.

Moreover, it can be argued that the arbitration panel's award did not "alter" the reserve system. To the extent that the reserve system did enable a club to perpetually control a player, it was not necessarily by virtue of successive invocations of the renewal clause,[22] or application of the reserve list and no-tampering rules[23] in the absence of a contractual obligation. Other provisions operate to deter a player from "playing out his option," as is evidenced by the fact that few players have done so.[24] On this basis, it may be said that the arbitration panel's decision did not change the reserve system, but merely interpreted various elements thereof under circumstances which had not previously arisen.

■ The 1973 agreement empowered the arbitration panel to "interpret, apply or determine compliance with the provisions of agreements" between the players and the clubs.[25] We find that the arbitration panel did nothing more than to interpret certain provisions of the Uniform Player's Contract and the Major League Rules. We cannot say that those provisions are not susceptible of the construction given them by the panel. Accordingly, the award must be sustained.[26]

## VI

The Club Owners finally contend that there are certain defects in the District Court's decree which render it invalid.

■ They argue that the decree impermissibly operates against entities who were not parties to the arbitration proceedings or the District Court action; namely, the National and American Leagues and their counsel. The panel's award, as enforced by the District Court, directed the *leagues* to instruct their member clubs that they may negotiate with Messersmith and McNally. The court's decree directed the *leagues' counsel* to notify their clients that the arbitration panel's award had been ordered enforced.

We find no reason to disturb the District Court's decree on the basis of this contention. First, F.R.C.P. 65(d) provides that an

---

**21.** In *Flood v. Kuhn, supra* at n. 14, both the majority opinion and Mr. Justice Marshall's dissent viewed the reserve system as involving perpetual player control, although that issue was not squarely before the Court. 407 U.S. at 259 n. 1, 289, 92 S.Ct. at 2100, 32 L.Ed.2d at 731.

**22.** Paragraph 10(a) of the Uniform Player's Contract.

**23.** Major League Rules 4A–(a) and 3(g).

**24.** *See* note 17, *supra.*

**25.** *See* text, *supra* at 4.

**26.** The Club Owners' arguments discussed above more properly relate to the question of whether the arbitration panel correctly decided the merits. That question, however, is not before us.

injunction is binding upon "the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order * * *." The leagues, which are unincorporated associations comprised of the Major League Clubs, and their counsel fall within these categories. Second, the leagues and their counsel were directed to perform notification functions only. The leagues perform many administrative functions on behalf of their members. We note that it was the league presidents, rather than the Club Owners individually, who signed the 1968, 1970 and 1973 collective bargaining agreements.

▮ The Club Owners also argue that the decree contravenes F.R.C.P. 65(d) in that it is vague and indefinite as to the act or acts it enjoined. We have examined the decree and perceive no error in that regard.

## CONCLUSION

We hold that the arbitration panel had jurisdiction to hear and decide the Messersmith-McNally grievances, that the panel's award drew its essence from the collective bargaining agreement, and that the relief fashioned by the District Court was appropriate. Accordingly, the award of the arbitration panel must be sustained, and the District Court's judgment affirmed. In so holding, we intimate no views on the merits of the reserve system. We note, however, that Club Owners and the Players Association's representatives agree that some form of a reserve system is needed if the integrity of the game is to be preserved and if public confidence in baseball is to be maintained. The disagreement lies over the degree of control necessary if these goals are to be achieved. Certainly, the parties are in a better position to negotiate their differences than to have them decided in a series of arbitrations and court decisions. We commend them to that process and suggest that the time for obfuscation has passed and that the time for plain talk and clear language has arrived. Baseball fans everywhere expect nothing less.

This Court's mandate affirming the judgment of the District Court shall issue seven days from the date this opinion is filed. Our previous order staying enforcement of the District Court's decree shall continue in effect until the issuance of the mandate.

GIBSON, Chief Judge (concurring).

I concur in the majority's statement of the facts and applicable law. However, because I believe this is a very close case—closer than perceived by the District Court and than expressed by the majority of this court—I do not feel comfortable with the analysis and conclusions drawn in parts IV and V of the majority opinion.

Though Article XV of the 1973 agreement cannot be read as an express provision clearly excluding the instant grievances from arbitration, its purpose was quite visibly to set aside the parties' ongoing disputes concerning the legality of and the concept of perpetual career-long control over a player by his first club and its assigns. That article provides:

*ARTICLE XV—Reserve System*

Except as adjusted or modified hereby, this Agreement does not deal with the reserve system. The Parties have differing views as to the legality and as to the merits of such system as presently constituted. This Agreement shall in no way prejudice the position or legal rights of the Parties or of any Player regarding the reserve system.

During the term of this Agreement neither of the Parties will resort to any form of concerted action with respect to the issue of the reserve system, and there shall be no obligation to negotiate with respect to the reserve system.

Further, the fact that other provisions of the 1973 agreement incorporate by reference the very provisions in the Uniform Players Contract, Regulations and Major League Rules that comprise the reserve system does not itself render Article XV ambiguous. The mere fact of incorporation of one document by another does not necessarily give the parties (or an arbitrator), acting

pursuant to the *incorporating* agreement, the power to alter the agreements *incorporated.*

The majority's analysis of the background of the 1973 agreement begins with the conclusion that "[t]he 1968 agreement clearly permitted the arbitration of grievances relating to the reserve system." Majority opinion, part IV, paragraph (a). This assumption in turn purportedly provides the basis for concluding that it "cannot be said that the Club Owners never consented to the arbitration of such grievances." *Id.* I believe this suggestion commences the analysis well beyond the starting point and carries it beyond the appropriate conclusion.

In Article VIII of the 1968 agreement the parties agreed to "review jointly" the matter of "possible alternatives to the reserve clause as now constituted" and to disavow any obligation "to bargain or seek agreement [on the matter] * * * during the term of" the 1968 agreement. This clearly indicates to me that the parties themselves did not think the issues of what constituted the reserve system, and what its proper reach and effect should be, were arbitrable. By agreeing to jointly review "the possible alternatives to the reserve clause as now constituted," the parties considered this issue as one for future review rather than arbitration. If in fact the parties were of the view that the steel bindings of the reserve system could be terminated with respect to any given player by merely playing out an option for one year, the Players Association should have had no further concern about the previous far-reaching consequences of reserving a player to his original team for his entire career.

In my view, the issue thus becomes whether this factual background, coupled with the fact that continued negotiations on the reserve system failed and were not carried forward into the 1970 and 1973 agreements, and the presence of the somewhat ambiguous Articles XIV and XV, respectively, in the 1970 and 1973 agreements, together present "the most forceful evidence of a purpose to exclude * * * from arbitration" disputes on the basic reserve system as the parties obviously understood it to exist in the 1973 agreement and other agreements incorporated therein by reference. *United Steelworkers of America v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 585, 80 S.Ct. 1347, 1354, 4 L.Ed.2d 1409, 1419 (1960). Up to that date no player had slipped, or even intimated that he could slip, the bindings of the reserve system by merely playing out a one year option. The reserve system was devised over many years by club and league rules and sanctioned by the players' contract.

The preponderance of the evidence as to the purpose of Article XV, considered upon the record as a whole, favors the Club Owners and indicates a conspicuous *mutual* intent to exclude matters such as the Messersmith and McNally grievances from the grievance and arbitration procedures established in Article X. However, the Club Owners' evidence does not appear sufficient to satisfy the enhanced standard of proof enunciated in *Warrior & Gulf, supra,* and the balance of the *Steelworkers* trilogy. Though the purpose of Article XV was to express the parties' *agreement* to set aside all disputes and *disagreements* concerning the reserve system in order to commence the 1973 baseball season, the evidence presented by the Club Owners disavowing any agreement to arbitrate the instant disputes and expressing the parties' mutual purpose to exclude the instant grievances from the procedures of Article X is not sufficiently forceful to deny the arbitration panel jurisdiction.

It is surprising and unfortunate that what reasonable and highly educated men might be expected to do and obviously did in the instant case was not forcefully expressed in their collective bargaining agreement. The pitfalls of collective bargaining are unmarked and many companies and industries have found themselves facing arbitration in situations they had no idea could end up in the arbitration domain. In adopting the presumption of arbitrability in the name of and under the banner of industrial peace, the courts have made it difficult to avoid arbitration on any topic. Almost any

word, phrase, or paragraph of a contract is susceptible of being viewed as containing ambiguities, and because our language is capable of different connotations, a case can be made for almost any complaint falling into the arbitration orbit, when arbitration is provided in the collective bargaining agreement.

The courts should not merely pay lip service to the principle that arbitration is a matter of agreement and that only those matters which the parties have agreed to submit to arbitration should be arbitrated. As suggested by the Second Circuit, the rule of the *Steelworkers* trilogy was adopted by the Supreme Court for a specific purpose:

> [To] cut through time consuming court proceedings and red tape, and set up as a matter of federal law a simple procedure, peculiarly suitable for the prompt disposition of *miscellaneous* disputes arising under collective bargaining agreements. [Emphasis added.]

*Procter & Gamble Independent Union v. Procter & Gamble Manufacturing Co.,* 298 F.2d 644, 646 (2d Cir. 1962); *see United Steelworkers of America v. Warrior & Gulf Navigation Co., supra,* 363 U.S. at 582, 80 S.Ct. at 1352, 4 L.Ed.2d at 1417.

However, in close cases such as the instant case involving disputes substantially affecting what is viewed as a basic structural component of the industry—the reserve system—we should be cautious not to merely mechanically apply the "presumption of arbitrability" as a means to avoid the task of carefully and realistically assessing the parties' actual agreement.

It thus appears to me that the Club Owners are stuck with the "presumption of arbitrability" and are unable to supply "the most forceful evidence of a purpose to exclude * * * from arbitration" these disputes on the reserve system, particularly in view of the wording of Article X(A)(1)(a), excluding certain issues from the grievance procedure without listing the reserve system as one of the exclusions. I therefore concur in the decision reached by the majority.